[No. 23559-5-II. Division Two. April 16, 1999.]

PAUL TELFORD, *Respondent*, v. THURSTON COUNTY BOARD OF COMMISSIONERS, *Defendant*, WASHINGTON STATE ASSOCIATION OF COUNTIES, ET AL., *Appellants*.

150

*Edward Holm, Prosecuting Attorney*, and *Elizabeth Petrich, Deputy*; and *William Dale Kamerrer* of *Law Lyman Daniel Kamerrer*, for appellants.
*Paul Telford*, pro se.

HOUGHTON, J. — The Washington State Association of Counties and the Washington State Association of County Officials appeal a summary judgment order declaring that they are public agencies for purposes of Washington's Public Disclosure Act. We affirm.

## FACTS
### A. Procedural Background

In November 1996, Paul Telford filed a lawsuit against

the Thurston County Board of Commissioners, the Washington State Association of Counties (WSAC), and the Washington State Association of County Officials (WACO),[1] to prevent their use of public funds in political campaigns.[2] He sought a judgment declaring that WSAC and WACO are subject to Washington's Public Disclosure Act, RCW 42.17, enjoining the Thurston County Commissioners from further improper use of public funds, and requiring reimbursement from WSAC and WACO to the counties.

The parties filed cross-motions for summary judgment. At oral argument, the parties agreed to limit the issues to the question of whether WSAC and WACO are public agencies under the Public Disclosure Act. After hearing argument, the trial court filed a memorandum opinion and an order granting partial summary judgment in favor of Telford, ruling that WSAC and WACO are "quasi-public agencies" subject to RCW 42.17.

WSAC and WACO filed two motions for reconsideration, one challenging some of the court's factual findings, and one challenging the court's ruling that the two entities are public agencies. The court denied both motions and entered findings of fact and a final judgment.

## B. History of WSAC and WACO

WSAC traces its roots back to 1906, when the "County Commissioners Association" held its first annual convention.[3] No details regarding the group's formation or its early years are known, but it appears to have been a forum

---

[1] The association's operating name is the Washington Association of County Officials, but its legal name is the Washington State Association of County Officials.

[2] WSAC and WACO have donated funds and used their facilities to support and oppose ballot measures and initiative campaigns and have donated to legislative caucuses. Such uses of public funds by public agencies are prohibited by RCW 42.17.128, .130, and .190.

[3] The parties have not supplied any records from 1906. This information is based upon documentation pertaining to the commissioners' eleventh annual convention, held jointly with the Washington State Association of County Engineers in 1917.

for discussing matters of common concern to the counties. In 1939, the Legislature formally acknowledged the association in a statute that declared it a public necessity to coordinate county administrative programs.[4] The legislation imposed on counties the following requirements:

> [I]t shall be the duty of County Commissioners to take such action as may by them be deemed necessary to effect coordination of such administrative programs, to prepare reports annually on the operations of all departments under their jurisdiction, and to submit biennially to the Governor and the State Legislature their joint recommendations on procedural changes which would increase the efficiency of any department.

LAWS OF 1939, ch. 188, § 2 (codified as amended at RCW 36.32.340).[5] This legislation designated WSAC as a coordinating agency to fulfill the statutory duties, and it permitted counties to reimburse WSAC from their general funds for these services:

> County Commissioners are hereby empowered to designate the Washington State Association of County Commissioners as a coordinating agency in the execution of duties imposed by this act and to reimburse said association from county current expense funds . . . for the costs of any such services rendered . . . .

LAWS OF 1939, ch. 188, § 3 (codified as amended at RCW 36.32.350).[6]

In 1980, WSAC incorporated as a nonprofit corporation. Its purpose, as stated in its articles of incorporation, is "the coordination of county administrative programs . . . the creation of more practical and efficient county legisla-

---

[4]The preamble to the statute states: "[t]hat the public necessity for the coordination of county administrative programs . . . be and is hereby recognized." LAWS OF 1939, ch. 188, § 1.

[5]The current legislation omits the requirement of a biennial report.

[6]The name of the group was changed in 1971 to drop the "commissioners" designation. LAWS OF 1971, ch. 85, § 3. This change was to accommodate charter counties, governed by county councils instead of county commissioners.

tion, administration and procedures . . . and a general improvement in the conduct of county administrative government in accordance with the provisions of Chapter 188, Laws of Washington, 1939." Although under RCW 36.32.350 membership in WSAC is optional, WSAC's articles of incorporation provide that "[a]ll duly elected . . . county commissioners [and charter county executive officials] in the State of Washington shall be members of the Association."

WACO organized sometime in the early 1950s. It was first mentioned in a 1953 resolution by the State Association of County Auditors and County Treasurers. The resolution called for the organization of a "State Association of Elected County Officials," whose purpose would be "to promote more uniform procedure in respective county offices in order to better serve the public[.]" The group met in 1955 and 1956 to discuss proposed legislation for the formation of the association. The group's proposed bill was adopted substantially unchanged by the Legislature in 1959. The act provided:

> It shall be the duty of the assessor, auditor, clerk, coroner, sheriff, superintendent of schools, treasurer, prosecuting attorney of each county in the state to take such action as they jointly deem necessary to effect the coordination of the administrative programs of each county and to submit to the governor and the legislature biennially a joint report or joint reports containing recommendations for procedural changes which would increase the efficiency of the respective departments headed by such elected county officials.

LAWS OF 1959, ch. 130, § 2 (codified as amended at RCW 36.47.020).[7] Like WSAC's statute, WACO's act empowered county officials to designate WACO as a coordinating agency for performing their statutory duties. LAWS OF 1959, ch. 130, § 3 (codified as amended at RCW 36.47.030). The only material difference between the two acts is that

---

[7] The statute has been amended to include appointive officials in charter counties and to omit the biennial reporting requirement.

WACO's financial records are statutorily subject to audit by the Washington State Auditor, but WSAC's records are not. RCW 36.47.060.

WACO became a nonprofit corporation in 1961. Under its Article II of incorporation, the corporation exists for "the public purpose of carrying out the mandate of the Washington State Legislature . . . through the use of public monies contributed to the corporation by the counties. . . ." All of the Washington counties have designated WACO as their coordinating agency and are contributing members.[8]

Most of WSAC's and WACO's income is derived from annual dues paid by its members. The dues are based upon each association's operating budget and a formula related to the population of each member county. The dues are paid by the counties with public funds, and most counties pay in advance.[9] The dues pay staff and support the associations' activities. Additional funds are generated from the sale of a joint directory, interest on savings, and conference and seminar registrations.[10]

Both WSAC and WACO are completely controlled by elected and appointed county officials. These officials constitute both associations' members and boards of directors. Except for the executive directors and some support staff, neither association has any members who are private citizens.

Until 1977, WSAC's and WACO's employees were mem-

---

[8]In 1977 and again in 1998, the Legislature passed a statute stating: "It is the desire of the legislature that [WACO and WSAC] . . . shall merge into one association of elected county officers. Only one association shall carry out the duties imposed by RCW 36.32.335 through 36.32.360 and 36.47.020 through 36.47.060." LAWS OF 1997-1998, ch. 245, § 29; LAWS OF 1977, Ex. Sess., ch. 221, § 2. To date the associations have not merged.

[9]The annual dues are billed in January for services to be rendered during that year. Some members pay the dues in a lump sum when billed; others pay in installments throughout the year.

[10]WSAC and WACO characterize these additional sources of income as nonpublic. But the activities that produce this additional income are supported by the membership dues and are possible because the dues are paid at the beginning of each fiscal year.

bers of Plan I of Washington's public employees' retirement system (PERS I). *See* RCW 41.40.010(4)(a) ("employer" includes "any political subdivision or association of political subdivisions of the state"). In 1977, the Legislature created PERS II and changed the definition of "employer" to "any political subdivision and municipal corporation of the state," thus excluding WSAC and WACO employees. LAWS OF 1977, Ex. Sess., ch. 295, § 16 (codified at RCW 41.40.010(4)(b)). Currently, WSAC has 11 full-time employees, 4 of whom remain PERS I members. Three of WACO's six employees are PERS I members.

WSAC and WACO own real and personal property, including a shared office building in Olympia and office furniture and equipment. WSAC owns two privately licensed automobiles. Both associations file federal tax returns as nonprofit corporations. Their funds are deposited with private banking institutions and they employ private accounting firms. WACO is also audited by the State Auditor and is a member of the Washington Counties Insurance Fund. RCW 36.47-.060. Both associations use the State of Washington SCAN (State Controlled Area Network) long-distance telephone system. The SCAN service is available only to public agencies and tax-exempt public nonprofit organizations. *See* RCW 39.34.

## ANALYSIS
### A. Summary Judgment

At issue in the summary judgment was the question whether WSAC and WACO are "agencies" under the Public Disclosure Act. The statutory definition includes:

> all state agencies and all local agencies. "State agency" includes every state office, department, division, bureau, board, commission, or other state agency. "Local agency" includes every county, city, town, municipal corporation, quasi-municipal corporation, or special purpose district, or any office, department, division, bureau, board, commission, or agency thereof, or other local public agency.

RCW 42.17.020(1). The trial court, using a functional equiv-

alent analysis, decided that WSAC and WACO are "quasi-public agencies" subject to the Public Disclosure Act. WSAC and WACO contend that there is no such thing as a "quasi-public agency,"[11] they do not fit the statutory definition of "agency," and they are private corporate entities under the functional equivalent analysis.

## 1. Standard of Review

■ Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We review the trial court's decision de novo. *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998). We construe the facts most favorably toward the nonmoving party. *Babcock v. State*, 116 Wn.2d 596, 599, 809 P.2d 143 (1991). In this case, the trial court entered findings of fact in a lengthy and carefully crafted memorandum opinion. But because summary judgment is appropriate only if there are no material issues of fact, the trial court's factual findings are not binding on appeal. *Duckworth v. City of Bonney Lake*, 91 Wn.2d 19, 21-22, 586 P.2d 860 (1978) (citing *Washington Optometric Ass'n v. Pierce County*, 73 Wn.2d 445, 438 P.2d 861 (1968)).

■■ The interpretation of a statute is a question of law reviewed de novo. *American Legion Post No. 32 v. City of Walla Walla*, 116 Wn.2d 1, 5, 802 P.2d 784 (1991); *Monroe v. Soliz*, 132 Wn.2d 414, 418, 939 P.2d 205 (1997). If a statute is plain and unambiguous, its meaning must be derived from the language of the statute itself. *Harmon v. Department of Soc. & Health Servs.*, 134 Wn.2d 523, 529-30, 951 P.2d 770 (1998) (citing *State v. Mollichi*, 132 Wn.2d 80, 87, 936 P.2d 408 (1997); *Marquis v. City of Spokane*, 130 Wn.2d 97, 107, 922 P.2d 43 (1996)). A statute is ambiguous if it is susceptible of two or more reasonable interpretations. *State*

---

[11]Appellants are correct that the Public Disclosure Act does not recognize "quasi-public agencies" per se. But the trial court was merely emphasizing that WSAC and WACO are hybrid entities and that whether they are "public" may depend upon the purpose for which the determination is made. The label used by the trial court is irrelevant to its finding that WSAC and WACO are subject to the Public Disclosure Act.

*v. Van Woerden*, 93 Wn. App. 110, 116, 967 P.2d 14, 17 (1998) (citing *State v. Sunich*, 76 Wn. App. 202, 206, 884 P.2d 1 (1994)).

Here, the statute is ambiguous as applied to WSAC and WACO. They are neither state agencies, nor offices, departments, bureaus, boards, commissions, or agencies of a local agency. To fit the statutory definition, they must qualify as "other local public agenc[ies]," which are not defined.

■ If a statute is ambiguous, resort to the tools of statutory construction is appropriate. *Harmon*, 134 Wn.2d at 529-30 (citing *State v. Bash*, 130 Wn.2d 594, 601-02, 925 P.2d 978 (1996)). Our paramount duty is to ascertain and to give effect to the Legislature's purpose and intent. *Marquis*, 130 Wn.2d at 108; *Koker v. Armstrong Cork, Inc.*, 60 Wn. App. 466, 470, 804 P.2d 659, *review denied*, 117 Wn.2d 1006 (1991).

2. Intent of the Public Disclosure Act

■■ The Public Disclosure Act, RCW 42.17 (PDA), was enacted as Initiative Measure No. 276 in 1972. *See* Laws of 1973, ch. 1. It prohibits the contribution of public funds to political campaigns and lobbying efforts, mandates reporting of public officials' financial affairs, and requires disclosure of public records.[12] RCW 42.17. The PDA is a strongly worded mandate. Its provisions are to be "liberally construed to promote complete disclosure of all information respecting the financing of political campaigns and lobbying, and the financial affairs of elected officials and candidates, and full access to public records . . . ."[13] RCW 42.17.010; *see Dawson v. Daly*, 120 Wn.2d 782, 788, 845 P.2d 995 (1993).

---

[12]The Public Disclosure Act's declared policies include: full disclosure of political campaign and lobbying contributions; avoidance of any conflict of public and private interests in the private financial dealings of public officials; disclosure and limitation of election campaign financing; and full access to information concerning the conduct of government on every level. RCW 42.17.010.

[13]Appellants argue that the "liberal construction" mandate applies to the PDA's provisions on complete disclosure, but not to the definitional provision of the act. This interpretation defies the plain language of the statute, which does not distinguish between definitional and substantive provisions. *See* RCW 42.17.010.

The PDA's prohibitions on the use of public funds for political purposes are clearly expressed: ''[p]ublic funds, whether derived through taxes, fees, penalties, or any other sources, shall not be used to finance political campaigns for state or local office.'' RCW 42.17.128. The act further provides:

> No elective official nor any employee of his office nor any person appointed to or employed by any public office or agency may use or authorize the use of any of the facilities of a public office or agency, directly or indirectly, for the purpose of assisting a campaign for election of any person to any office or for the promotion of or opposition to any ballot proposition.

RCW 42.17.130. But the PDA permits public agencies to engage in certain lobbying activities with respect to the Legislature:

> Any agency . . . may expend public funds for lobbying, but such lobbying activity shall be limited to (a) providing information or communicating on matters pertaining to official agency business to any elected official or officer or employee of any agency or (b) advocating the official position or interests of the agency to any elected official or officer or employee of any agency. . . .

RCW 42.17.190(3).

■ In sum, the intent of the PDA is to promote government accountability and to limit campaign financing. The PDA not only requires disclosure of public records, but also it restricts the use of public funds for political purposes, clearly delineating the circumstances under which such expenditures are permissible. Its provisions are to be broadly and liberally construed to promote these ends. RCW 42.17.010; *Dawson*, 120 Wn.2d at 788.

3. Intent of the WSAC/WACO Legislation

■ The statutes relating to WSAC and WACO both declare the public necessity of coordinating county administrative programs. RCW 36.32.335, 36.47.010. Both acts require county officials to take such action as is necessary

to effect this coordination and empower the counties to employ WSAC/WACO to fulfill their statutory duties. RCW 36.32.340-.350, 36.47.020-.030. Counties may reimburse WSAC/WACO from their current expense funds for services rendered. RCW 36.32.350, 36.47.040. The manner in which such reimbursements may be made specifically evinces an intent to protect against any misuse of county funds: "[s]uch reimbursement shall be paid on vouchers submitted to the county auditor and approved by the county legislative authority . . . and the vouchers shall set forth the nature of the service rendered, supported by affidavit that the service has actually been performed."[14] RCW 36.32.350; *see* RCW 36.47.040. WACO's statute is even more particular:

> no reimbursement shall be made to the association for any expenses incurred under RCW 36.47.050 for travel, meals, or lodging of such county officials, or their representatives at such meetings, but such expenses may be paid by such official's respective county as other expenses are paid for county business.

RCW 36.47.040. And WACO's financial records are subject to audit by the State Auditor. RCW 36.47.060.

█ The intent of these statutes is the statewide coordination of county administrative programs. Although the counties are permitted, but not required, to use WSAC and WACO to fulfill their statutory duties, they are not expressly permitted to disburse public funds to any other entity for this purpose. The expenditure of public funds is restricted to that which is necessary to fulfill the statutory coordinating requirements.[15]

---

[14]WSAC's and WACO's current practice of collecting annual dues at the beginning of the year to support that year's operating budget violates the statutory requirement.

[15]The statutes originally limited the amount counties could pay WSAC and WACO, but that restriction has been deleted. *See* Laws of 1939, ch. 188, § 3 (limiting total annual sum paid to WSAC to .01 mill per county); Laws of 1959, ch. 130, § 4 (same limitation applies to WACO).

### 4. Functional Equivalent Analysis

 The trial court determined that WSAC and WACO have some public and some private attributes. Because the Legislature did not clearly intend to include or exclude hybrid agencies from the PDA and no Washington case law speaks to the issue, the trial court employed the "functional equivalent" test to make its ruling. The test determines, on a case-by-case analysis of various factors, whether a particular entity is the functional equivalent of a public agency for a given purpose.

 Federal courts developed the functional equivalent test to determine whether entities were subject to the Freedom of Information Act (FOIA).[16] *See Public Citizen Health Research Group v. Department of Health, Educ. & Welfare*, 668 F.2d 537, 543-44 (D.C. Cir. 1981); *Rocap v. Indiek*, 539 F.2d 174, 180-81 (D.C. Cir. 1976); *Washington Research Project, Inc. v. Department of Health, Educ. & Welfare*, 504 F.2d 238, 245-46 (D.C. Cir. 1974), *cert. denied*, 421 U.S. 963 (1975). Cases interpreting FOIA are relevant when we interpret our state act. *Dawson*, 120 Wn.2d at 791-92 (citing *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 128, 580 P.2d 246 (1978)). Other state courts and the state Attorney General have also adopted this test. *See, e.g., Board of Trustees v. Freedom of Info. Comm'n*, 181 Conn. 544, 436 A.2d 266, 270 (1980); *Marks v. McKenzie High Sch. Fact-Finding Team*, 319 Or. 451, 878 P.2d 417, 424-25 (1994); 1991 Op. Atty. Gen. No. 5 (analyzing whether the Small Business Export Finance Assistance Center is subject to the Open Public Meetings Act and Public Disclosure Act). Its use is consistent with Washington law that holds that the meaning of the term "agency" as used in a statute depends upon the context in which it is used, not merely on the label given to an entity. *Graham v. Washington State Bar Ass'n*, 86 Wn.2d 624, 626, 548 P.2d 310 (1976) (whether bar association is "agency" within meaning of auditing statutes depends on context; reference in State Bar Act to

---

[16]5 U.S.C. § 552.

bar association as "an agency of the state" is not disposi-tive); *see also Washington Research Project*, 504 F.2d at 245-46 ("[A]ny general definition [of an agency] can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the busi-ness of government done.").

The Connecticut Supreme Court has adopted a four-factor test culled from federal case law. The factors are: (1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of govern-ment involvement or regulation; and (4) whether the entity was created by government. *Board of Trustees*, 436 A.2d at 270-71 (citing *Rocap*, 539 F.2d at 180; *Washington Research Project*, 504 F.2d at 246-48; *Public Citizen Health Research Group v. Department of Health, Educ. & Welfare*, 449 F. Supp. 937, 941 (D.D.C. 1978), *reversed on other grounds*, 668 F.2d 537 (D.C. Cir. 1981)). The Connecticut courts bal-ance these factors in applying the test. *See Domestic Violence Servs. v. Freedom of Info. Comm'n*, 47 Conn. App. 466, 478, 704 A.2d 827, 834 (1998). The state Attorney General also employed the four-factor test, but required that each criterion be satisfied.[17] 1991 Op. Atty. Gen., No. 5. A balancing of factors, however, is more suitable to the functional, case-by-case approach of Washington law.

Recently the Oregon Supreme Court, also citing federal case law, adopted a nonexclusive six-factor functional equiv-alent test, weighing: (1) the performance of governmental functions by the entity; (2) the presence of substantial government control over the entity's day-to-day operations; (3) the authority of the entity to make and implement deci-sions; (4) the nature of the government's financial involve-ment with the entity; (5) the existence of a federal charter; and (6) the status of the entity's employees. *Marks*, 878

---

[17]This application of the test may have been in error. The Attorney General opinion cites *Board of Trustees*, 436 A.2d at 270-71, for the proposition that all four factors must be met. The *Board of Trustees* case merely states that all of the factors *were* met in that particular case and goes on to note that a case-by-case "application of the factors" is most appropriate. *Board of Trustees*, 436 A.2d at 271.

P.2d at 423 (citing *Railway Labor Executives' Ass'n v. Consolidated Rail Corp.*, 580 F. Supp. 777, 778-79 (D.D.C. 1984)).

The two additional factors used by the Oregon court are not particularly relevant in the context of Washington's PDA. Washington's PDA, unlike FOIA and the disclosure acts of most states, broadly prohibits government spending for political campaigns and promotes disclosure of such expenditures. Whether an entity has authority to make and implement decisions may be relevant to determining whether that entity's records should be available to the public, but it has no relation to the misappropriation of public funds. To the extent that such a consideration is relevant, it can be considered under the "government function" factor. And the status of an entity's employees, insofar as it sheds any light on legislative intent, can be considered under the "government funding" factor. Therefore, the four-factor balancing test is more appropriate for evaluating an entity's status under the PDA.

a. Governmental Function

The function of WSAC and WACO is statewide coordination of county administrative programs, declared by the Legislature to be a public purpose. Although the associations perform mainly advisory functions and do not govern citizen action, they largely determine the manner in which county programs are administered.

WSAC and WACO are mentioned in 35 statutes in addition to their enabling legislation.[18] These statutes impose additional "public" duties on the associations such as consulting with state and county officials,[19] appointing

---

[18]RCW 9.94A.060, 17.10.030, 36.21.011, 36.40.040, 36.70A.131, 36.78.030, 36.110.030, 38.52.530, 43.20.030, 43.20A.685, 43.21C.130, 43.21J.030, 43.30.040, 43.31.621, 43.31.855, 43.32.010, 43.51.340, 43.51.456, 43.103.040, 43.110.010, 43.110.030, 43.155.030, 46.09.110, 46.10.080, 46.10.220, 47.06A.030, 47.26.121, 58.17.260, 70.05.125, 70.94.537, 70.95.090, 70.95.265, 79.72.020, 82.80.070, 84.48.042.

[19]*See, e.g.*, RCW 36.40.040 (state auditor to consult with WSAC and WACO in prescribing a standard classification of accounts); RCW 36.21.011 (state department of personnel to consult with WSAC in maintaining classification and salary plan for assessors' employees).

persons to state and county boards and committees,[20] and participating in various state boards and commissions.[21] These duties could not be delegated to the private sector.

b. Government Funding

Most of WSAC's and WACO's funds come from current county expense funds via membership dues. WSAC and WACO assert that these public funds are consideration for services they provide, and therefore the funds become private when received by WSAC/WACO. This argument ignores that the dues are based upon an annual operating budget and are paid before services are rendered.[22] The dues support the associations' entire operations; they are not identified for specific goods or services. *Cf. Weston v. Carolina Research & Dev. Found.*, 303 S.C. 398, 401 S.E.2d 161, 165 (1991) (FOIA does not apply to business enterprises that receive public money in return for specific goods on an arms-length basis, but when a block of public funds is diverted en masse, the public must have access to records of the spending organization to determine how the funds were spent).

The funding system employed by WSAC/WACO contravenes the statutes allowing them to receive public funds in the first instance. Those statutes permit county funds to be disbursed only *after* statutorily required services are rendered. *See* RCW 36.32.350, 36.47.040. To allow counties to allocate a block of public funds to be spent entirely at the discretion of the associations as if the funds were private violates the clear intent of the statutes.

---

[20]*See, e.g.*, RCW 36.78.030 (county road administration board to be appointed by WSAC); RCW 43.32.010 (state design standards committee members to be appointed by WSAC's executive committee).

[21]*See, e.g.*, RCW 43.59.030 (representative of WACO to be on Washington traffic safety commission); RCW 9.94A.060 (member of WSAC to be on sentencing guidelines commission).

[22]Appellants argue that they begin providing services as of January 1st each year, therefore they actually render services in advance of payment. But the annual dues are based upon an operating budget adopted prior to the beginning of the year and are paid either in a lump sum during the first quarter of the year or in installments. In either case, most of the funds are received in advance of the services provided.

WSAC and WACO receive some additional governmental benefits: some of their employees are members of the Washington public employees' retirement system; both associations take advantage of Washington's SCAN telephone system; and WACO is a member of the Washington Counties Insurance Fund. Both associations are therefore mostly supported by public funds.

### c. Government Control

Generally there is no outside government control of WACO and WSAC, except that WACO's financial records are subject to audit by the State Auditor. But the associations themselves are completely controlled by elected and appointed county officials. There is no private sector involvement or membership.

### d. Entities' Origin

Although WSAC and WACO existed before legislative recognition, they were formed by county officials acting in their official capacities in the furtherance of county business.[23] The associations were then recognized by the Legislature as coordinating agencies to carry out state policy. Although membership in the associations is technically optional, all of the county officials are, in fact, members; they could hardly carry out their statutory duties in any other way.

### 5. Balancing of Factors

Although WSAC and WACO retain some characteristics of private entities, their essential functions and attributes are those of a public agency. They serve a public purpose, are publicly funded, are run by government officials, and were created by government officials. Analyzing these factors in the context of the intent of the PDA and the other relevant statutes reinforces the conclusion that the associations are public. The PDA is to be construed broadly to promote disclosure and accountability. The

---

[23]Appellants assert that the associations were created by private citizens interested in the efficient functioning of county government. But clearly when the county commissioners met at an annual commissioners' convention, they were attending as "commissioners," not private citizens.

WSAC/WACO statutes are intended to restrict public funding of the associations to statutorily mandated services. Allowing WSAC/WACO to use their public funds to support private political agendas would contravene both policies. Therefore, the trial court correctly ruled that, for purposes of the PDA, WSAC and WACO are "agencies." Thus, the court's ruling denying appellants' motion for reconsideration based upon the same arguments was also proper.

### B. Motion for Partial Reconsideration

WSAC and WACO moved for partial reconsideration based upon several alleged factual errors contained in the trial court's memorandum opinion.[24] The court denied the motion on the ground that the parties had stipulated to the facts as set forth in the opinion. Clerk's Papers (CP) 589-91. Denial of a motion for reconsideration is reviewed for a clear or manifest abuse of discretion. *Meridian Minerals Co. v. King County*, 61 Wn. App. 195, 203-04, 810 P.2d 31, *review denied*, 117 Wn.2d 1017 (1991). Abuse of discretion occurs where the trial court's decision rests on untenable grounds or untenable reasons. *Kleyer v. Harborview Med. Ctr.*, 76 Wn. App. 542, 545, 887 P.2d 468 (1995).

A review of the record is inconclusive as to whether WSAC and WACO expressly made such a stipulation. CP 565-77. But none of the alleged errors in the facts recited by the trial court is material to the court's determination below or to our determination here.[25] Therefore, the trial court did not abuse its discretion in denying the motion for partial reconsideration.

Affirmed.

---

[24]Some of the alleged errors are contained in the court's listing of "evidence considered" rather than its "findings of fact." The former errors are inconsequential for any purpose.

[25]The disputed facts are: (1) WSAC and WACO receive their dues in advance of providing any services; WSAC/WACO assert that they provide services beginning January 1st of each year, before dues are received; (2) WACO contributed $41,648.24 to oppose Initiative 559 in 1992; WACO alleges it contributed only $16,980.30 to the initiative, and the remainder went to other lobbying activities; (3) WSAC and WACO used their staff and offices in the campaign to put Referendum 48 on the ballot in 1995; only WSAC participated in those activities.

ARMSTRONG, A.C.J., and HUNT, J., concur.

Review denied at 138 Wn.2d 1015 (1999).