# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| WOODLAND PARK ZOO a/k/a WOODLAND PARK ZOOLOGICAL SOCIETY, | ) ) ) | NO. 72413-4-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| ALYNE FORTGANG, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 1, 2016 |
| | ) | |

LAU, J. — Alyne Fortgang sued the Woodland Park Zoological Society (WPZS) under the Washington Public Records Act (PRA) seeking documents related to WPZS' operation of the Woodland Park Zoo. She appeals the trial court's order granting WPZS' motion for summary judgment and dismissing her claims, arguing that under the Telford[1] factors, WPZS is the functional equivalent of a government agency subject to the PRA. Applying Telford's four-factor analysis here, we conclude these factors weigh against concluding that WPZS is the functional equivalent of a government agency subject to the PRA. We affirm the order granting summary judgment in favor of WPZS.

---

[1] Telford v. Thurston County Bd. of Comm'rs, 95 Wn. App. 149, 974 P.2d 886 (1999).

FACTS

For 100 years, the City of Seattle (the City) owned and managed the Woodland Park Zoo (the Zoo) directly through the Department of Parks and Recreation. In 2000, the Washington State Legislature enacted Senate Bill 6858, codified at RCW 35.64.010, which governs city contracts "with one or more nonprofit corporations or other public organizations for the overall management and operation of a zoo . . . ." RCW 35.64.010(1). In 2002, the City entered into a 20-year operations and management agreement granting the Woodland Park Zoological Society exclusive authority to manage and operate the Zoo. WPZS is a nonprofit corporation formed in 1965 "for charitable, scientific and educational purposes for the study and promotion of zoology and wildlife conservation and for the education and recreation of the public." Clerk's Papers (CP) at 33.

The Operations and Management Agreement[2]

Under the management agreement, the City transferred control of the Zoo to WPZS: "by virtue of its purposes, interests and past successes, [the Zoo Society] is both experienced and well suited to administer, plan, manage, and operate the Zoo through an agreement with the City . . . ." CP at 34. WPZS exercises authority over nearly every aspect of operating the Zoo, including:

- Authority to set prices for admission, memberships, merchandise, and other Zoo-related sales.

- Authority to "make such capital improvements and alterations to the Premises and the Zoo facilities as WPZS shall determine in its reasonable discretion are necessary." CP at 48.

---

[2] The opinion refers to the operations and management agreement interchangeably as "agreement" or contract".

-2-

- Authority regarding care of the animals, including the authority "to acquire or sell or otherwise dispose of Zoo animals in the course of WPZS's operation of the Zoo." CP at 49.

- Authority to "manage, supervise . . . direct . . . hire, fire, and otherwise discipline" Zoo employees. CP at 50.

The agreement also transferred all personal property necessary to operate the Zoo to WPZS, including the animals. The agreement also assigned all Zoo-related contracts to WPZS: "[t]he City shall assign all such existing leases, agreements, and arrangements affecting the Zoo . . . to [WPZS] and [the Zoo Society] shall have the exclusive option . . . of renewing such agreements." CP at 42.

WPZS receives funding from the City. The City distributes $2,500,000 to WPZS under a City sponsored "Neighborhood Parks, Green Spaces, Trails and Zoo" levy. CP at 37, 44. The agreement grants WPZS the right of termination if the City chooses not to renew the levy. WPZS also receives an annual payment from the City's general fund, which started at $5,000,000 in the first year of the agreement and increases each year by 70% of the increase in the "Consumer Price Index for Urban Wage Earners and Clerical Workers for the Seattle-Tacoma-Bremerton area." CP at 42. The City also provides annual maintenance payments of $500,000. WPZS can apply for grants for which it might otherwise be ineligible if it obtains approval from the superintendent of the Parks Department or the City Council. Despite this city funding, taxpayer money accounts for a minority of WPZS' revenue. For example, in 2013, only 16 percent of its revenue came from public funds. WPZS earns most of its revenue from private donations, investments, and selling Zoo-related goods and services (admission revenue, memberships, souvenirs, concessions, private events, etc.).

The City retains some oversight authority via contract over certain aspects of Zoo management. For example, although WPZS has almost complete control over Zoo operations, including the authority to acquire or dispose of an animal. The agreement requires that any animal acquisition or disposition "shall be made in strict accordance with . . . existing and any adopted acquisition and disposition policies approved by the City." CP at 49. The City retains ownership of the Zoo premises and facilities in addition to "all appurtenances, fixtures, improvements, equipment, additions and other property attached or installed in the Premises during the Term" of the agreement. CP at 48. It also retains the naming rights for the Zoo and Zoo facilities. Further, the mayor, the Parks Department superintendent, and the City Council Park Committee, are each authorized to appoint one person to WPZS' Board of Directors, for a total of three City-appointed board members. As of 2014, 38 members served on WPZS' Board of Directors.

The agreement requires WPZS to comply with several reporting measures. For example, WPZS must provide the Parks Department Superintendent (1) an annual report, (2) an annual plan, and (3) monthly finance reports. The annual report must "provide a general summary of the Zoo's operations and will include a complete financial accounting for all funds, including use of Levy proceeds, use of major maintenance funding, and a listing of all capital investments made at the Zoo." CP at 53. WPZS must also submit monthly reports to the superintendent detailing the Zoo's finances. The annual plan must "present the one-year capital improvement plan for the Zoo, a description of major programmatic changes planned at that time for the ensuing year and any proposed changes in fees at the Zoo." CP at 53. WPZS must provide

-4-

quarterly reports to the Parks Board "setting forth a summary of the operations of the Zoo." CP at 54. Separate quarterly reports must be provided to the Oversight Committee "monitoring expenditure of Levy funds." CP at 54. WPZS must perform an independent audit every year and provide a copy of the audit to the superintendent. The agreement requires WPZS to submit to an audit by the City, if the City requests.

No provision of the agreement requires WPZS to comply with the Public Records Act (PRA). It does require WPZS to provide some information to the public. The only Zoo-related records that the agreement explicitly states must be disclosed are "records pertaining to the veterinary management and treatment of Zoo animals in its care." CP at 54. WPZS must make these records available to the superintendent or a member of the public if requested. WPZS must also provide the public with an opportunity to review and comment on its annual reports and annual plans. Similarly, for major capital projects, WPZS must "develop . . . a process for public involvement that is consistent with the Parks Department's Public Involvement Policy." CP at 55. The agreement requires notice and opportunity for public participation for regularly scheduled WPZS Board meetings.

<u>The Records Request and Ensuing Litigation</u>

In November 2013, Alyne Fortgang, concerned taxpayer and co-founder of Friends of Woodland Park Zoo Elephants (FWPZE), sent a letter to WPZS requesting certain records pursuant to the Washington Public Records Act. Some of the requests sought records relating to medical care and general treatment of the Zoo's elephants. Other requests sought internal documents about a public relations campaign WPZS undertook to counteract criticism of its elephant program. The request sought copies of

contracts or agreements between WPZS and public affairs consulting firm Cocker Fennessey, invoices or calculations of the total cost of the public relations campaign, and documents related to any public polling or survey results collected. WPZS provided documents related to its treatment of the elephants, acknowledging that it is required to disclose animal records under the agreement. It declined to respond to the other requests, asserting it is not a government entity and therefore not subject to the PRA.

In March 2014, Fortgang sued WPZS, alleging it violated the PRA by withholding the requested documents. On cross-motions for summary judgment, the trial court ruled WPZS is not the functional equivalent of a government agency under Telford v. Thurston County Bd. of Comm'rs, 95 Wn. App. 149, 974 P.2d 886 (1999), and consequently outside the scope of the PRA. Fortgang appeals.

ANALYSIS

Standard of Review

We review a trial court's order granting summary judgment de novo. Reid v. Pierce County, 136 Wn.2d 195, 201, 961 P.2d 333 (1998). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Here, the parties agree there are no disputed material issues of fact. The key issue presented here is whether WPZS is the functional equivalent of a government agency for purposes of the PRA. We apply Telford's four-factor test to resolve this issue.

Whether WPZS Constitutes the Functional Equivalent of a Government Agency

The PRA "is a strongly worded mandate for broad disclosure of public records." Hearst Corp. v. Hoppe, 90 Wn.2d 123, 127, 580 P.2d 246 (1978). It advances a broad public policy for transparency at all levels of government, stating:

> (2) That the people have the right to expect from their elected representatives at all levels of government the utmost of integrity, honesty, and fairness in their dealings.
> . . .
> (4) That our representative form of government is founded on a belief that those entrusted with the offices of government have nothing to fear from full public disclosure of their financial and business holdings, provided those officials deal honestly and fairly with the people.
>
> (5) That public confidence in government at all levels is essential and must be promoted by all possible means.
>
> (6) That public confidence in government at all levels can best be sustained by assuring the people of the impartiality and honesty of the officials in all public transactions and decisions.

RCW 42.17A.001. Courts must liberally construe the PRA "to promote this public policy and to assure that the public interest will be fully protected." RCW 42.56.030. "While these declarations of policy do not have any independent operative effect, they 'serve as an important guide in determining the intended effect of the operative sections' of the PRA." Cedar Grove Composting, Inc. v. City of Marysville, 188 Wn. App. 695, 709, 354 P.3d 249 (2015) (quoting Hearst Corp., 90 Wn.2d at 128).

Under the PRA, any government agency "shall make available for public inspection and copying all public records" upon request unless those records fall into certain specific exemptions. RCW 42.56.070(1). The PRA defines "agency" as any state or local government agency. RCW 42.56.010(1).

-7-

The Telford Four-factor Analysis

Even a nongovernment entity may be subject to the PRA if it is "the functional equivalent of a public agency for a given purpose." Telford, 95 Wn. App. at 161. In Telford, the court adopted a four-factor balancing test for determining whether a nongovernment entity is the functional equivalent of a public agency for purposes of the PRA: "(1) whether the entity performs a governmental function; (2) the level of government funding; (3) the extent of government involvement or regulation; and (4) whether the entity was created by government." Telford, 95 Wn. App. at 162.[3] "Under Telford, each of these criteria need not be equally satisfied but rather the criteria on balance should suggest that the entity in question is the functional equivalent of a state or local agency." Clarke v. Tri-Cities Animal Care & Control Shelter, 144 Wn. App. 185, 192, 181 P.3d 881 (2008) "In determining whether a particular entity is subject to the PRA, courts engage in a practical analysis." Worthington v. Westnet, 182 Wn.2d 500, 508, 341 P.3d 995 (2015).

Thus, our analysis under Telford must be grounded in the unique factual circumstances present in each case. Due to the various ways in which a government may partner with a private entity, the Telford test requires a functional, case-by-case approach. Telford, 95 Wn. App. at 162 (No single factor under the Telford test is dispositive. Rather, "[a] balancing of factors . . . is more suitable to the functional, case-by-case approach of Washington law."). Indeed, "any general definition [of government

---

[3] We note the Washington Supreme Court has yet to apply the Telford test. See Worthington v. Westnet, 182 Wn.2d 500, 508, 341 P.3d 995 (2015) (stating that the Telford factors, though instructive, had limited applicability in determining whether a multijurisdictional drug task force was subject to the PRA).

agency] can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of government done. The unavoidable fact is that each new arrangement must be examined anew and in its own context." Wash. Research Project, Inc. v. Dep't. of Health, Educ. & Welfare, 164 U.S. App. D.C. 169, 504 F.2d 238, 245–46 (1974).[4]

Under the circumstances here, the Telford four factors weigh against concluding that WPZS is a functional equivalent of a government agency subject to the PRA.

Government Function

This factor considers whether the entity performs a government function. Pursuant to contract, WPZS exclusively manages and operates the Zoo. These services undoubtedly provide a public benefit. But serving public interests is not the exclusive domain of the government.

In Spokane Research & Defense Fund v. West Central Development Assoc., 133 Wn. App. 602, 137 P.3d 120 (2006),[5] Division Three of this court concluded that the operation of a neighborhood-based nonprofit community center to provide community services to benefit low and moderate income residents was not a governmental function. Spokane, 133 Wn. App. at 609-10.

---

[4] The functional equivalent test is derived from federal jurisprudence. Thus, federal cases interpreting the Freedom of Information Act (FOIA) are relevant when Washington courts interpret the PRA. Dawson v. Daly, 120 Wn.2d 782, 791–92, 845 P.2d 995 (1993), overruled on other grounds by Progressive Animal Welfare Soc'y. v. Univ. of Wash., 125 Wn.2d 243, 884 P.2d 592 (1994); see also, Telford, 95 Wn. App. at 161.

[5] Arguably, the court's Telford four-factor analysis constitutes dicta. The court stated that there was no need to apply the Telford test because there was "no ambiguity as to the Associations' [nongovernmental] status." Spokane, 133 Wn. App. at 608. The court nevertheless analyzed the Telford factors "solely for argument", concluding the result would be the same under that test. Spokane, 133 Wn. App. at 608.

The court reasoned, that despite the center's commitment to public interests, it provided services that could be delegated to the private sector and therefore, performed no governmental function:

> The Association functions to provide community services to benefit low to moderate income residents. While the government often provides social programs, serving public interests is not the exclusive domain of the government. Unlike in Telford, the Association's function is one that may be "delegated to the private sector."

Spokane Research, 133 Wn. App. at 609 (quoting Telford, 95 Wn. App. at 164). Fortgang claims that operating a zoo, like any park or recreational facility, is a quintessential governmental function. We disagree. Operating a zoo does not necessarily implicate any function unique to government. Indeed, private zoos have existed alongside publicly owned zoos for decades, including in Washington.[6]

Fortgang relies on nonPRA cases to make her point—City of Seattle v. State, 59 Wn.2d 150, 367 P.2d 123 (1961) and Okeson v. City of Seattle, 150 Wn.2d 540, 78 P.3d 1279 (2003). We are not persuaded. Seattle involved whether a State excise tax extended to services provided by the Seattle Parks Department, including towel rentals, pony rides, and rental space for concession vehicles. Seattle, 59 Wn.2d at 152. The Seattle court expressly stated that it was "unnecessary to consider whether the particular activities are governmental . . . in nature." Seattle, 59 Wn.2d at 154. Similarly, the Okeson court held that providing city street lighting is a government function, the costs of which "must be borne by Seattle's general fund" rather than a

---

[6] For example, the Cougar Mountain Zoo in Issaquah, Washington, has been privately owned and operated since its inception in 1972. See History, Cougar Mountain Zoo, http://www.cougarmountainzoo.org/About%20Zoo/history.aspx (last visited [Jan. 14, 2016]).

proprietary function for which utility customers may be charged. Okeson, 150 Wn.2d at 545. Okeson's government function analysis is unique to how city governments allocate the cost of services. It provides no analysis on whether a private entity is the functional equivalent of a government agency for purposes of the PRA.

In Clarke, the court held that the Tri-Cities Animal Care & Control Shelter (TCAC)—"a privately-run corporation that contracts with the [Tri-Cities] to provide animal control services," Clarke, 144 Wn. App. at 188—was subject to the PRA. Clarke, 144 Wn. App. at 196. Applying the Telford factors, the court concluded the TCAC performed "core government functions." Clarke, 144 Wn. App. at 194. The court analogized the duties of animal control officers to law enforcement officers. It noted TCAC's duties involved the exercise of police power, implicating due process concerns:

> Individuals associated with TCAC take oaths as animal control officers; animal control officers can be employed only by an animal care and control agency. See former RCW 16.52.011(2)(c) (1994). As part of the oath, the employees of TCAC agree to enforce the area's animal control regulations. As regulators, TCAC and its officers execute police powers in carrying out their duties, most notably impounding and destroying private citizens' pets. These types of acts implicate due process concerns . . . The implication of police powers is clear from the language of former RCW 16.52.015(2), which requires animal control officers to comply with 'the same constitutional and statutory restrictions concerning the execution of police powers imposed on law enforcement officers . . .' Because a local government grants TCAC the ability to execute police powers pursuant to state statute, TCAC is performing a governmental function.

Clarke, 144 Wn. App. at 193 (emphasis added).

Telford involved The Washington State Association of Counties (WSAC) and the Washington State Association of County Officials (WACO), entities founded and organized by elected and appointed county officials empowered statewide to administer government programs. Telford, 95 Wn. App. 163-65. State statutes imposed explicitly

nondelegable public duties on these entities. The court noted that these duties "could not be delegated to the private sector." Telford, 95 Wn. App. at 163-64.

The court held that under these circumstances WSAC and WACO were public entities for purposes of the PRA. These entities retained characteristics of private entities, but "their essential functions and attributes are those of a public agency." Telford, 95 Wn. App. at 165.

As to the government function factor, Clarke and Telford are distinguishable. Unlike the present case, Clarke involved the local government's grant of police powers (implicating due process concerns) to the private entity and contracting out this essential government function—animal control services. Telford also involved essential government functions.[7]

Acknowledging that "Telford's analysis seems to hinge on whether the entity's duties can be delegated to the private sector", Clarke explained this statement by concluding that a "local government" can delegate its "performance authority" to a "private entity" but it "cannot delegate away its statutory responsibility" under the PRA. Clarke, 144 Wn. App. at 194. Because TCAC was "perform[ing] core government functions," allowing the governmental agencies to contract with private agencies to performs these "core functions" contravenes the intent of the PRA. Clarke, 144 Wn. App. at 194. Here, the contractual services provided by WPZS do not implicate "core

---

[7] The parties read Telford's single statement, "[t]hese duties could not be delegated to the private sector" too broadly. Telford, 95 Wn. App. at 164. We read this statement in context to mean the duties that may not be delegated to the private sector are the additional public duties "mentioned in the 35 statutes" and "their enabling legislation." Telford, 95 Wn. App. at 163-64. We note that nothing in the opinion explains or analyzes the significance of this bare statement.

government functions." Thus, Clarke's legitimate concern over evading PRA requirements via "out sourcing" "core government functions" are not present in this case.

WPZS shares some nominal similarities to a government agency given its commitment to the public interest. But this is not sufficient to conclude it performs a government function. Fortgang fails to point to any Zoo operation that resembles a "core government function" that could not be wholly delegated to the private sector as in Telford and Clarke. WPZS is not performing a governmental function. This factor weighs against concluding that WPZS is subject to the PRA.[8]

### Government Funding

Fortgang contends the amount of money WPZS received from the City alone weighs in favor of finding government funding. We disagree.

Public funding comprises a minority of WPZS' revenue. Washington courts have consistently concluded that the government funding factor weighs in favor of applying the PRA only when a majority of the entity's funding comes from the government. In Telford, the court reasoned that this factor weighed in favor of applying the PRA because "[m]ost of WSAC's and WACO's funds come from current county expense funds. . . . Both associations are therefore mostly supported by public funds." Telford, 95 Wn. App. at 164-65. Similarly, in Clarke, the court concluded that "[n]early all of TCAC's operating budget comes from public money. . . . Thus, this factor clearly weighs in favor of application of the [PRA]." Clarke, 144 Wn. App. at 194-95. We applied a

---

[8] Given our discussion, we need not address Fortgang's enabling legislation claims.

similar rule in <u>Cedar Grove</u>: "Marysville paid Strategies for at least the majority of the work at issue . . . Its activities . . . were paid in large part with public funds." <u>Cedar Grove</u>, 188 Wn. App. at 720. In <u>Spokane Research</u>, the court stated the neighborhood association was not the equivalent of a government agency when a quarter of its funding came from private sources, "[t]he Association receives funding from various public and private sources. About 25 percent is private funding. . . . In sum, the Association's funding does not weigh for application of the [PRA]." <u>Spokane Research</u>, 133 Wn. App. at 609. The facts here present an even stronger case for concluding that the funding factor weighs against application of the PRA because the majority of WPZS' funding comes from private sources. In 2013, only 16 percent of WPZS' funding came from the City.

Fortgang relies heavily on the amount of money WPZS receives from the City, claiming that "the most significant <u>Telford</u> factor in this case is government funding." Br. of Appellant at 15. According to Fortgang, the total amount of money alone is sufficient for the court to conclude that the government funding factor weighs in favor of applying the PRA. Fortgang cites a case discussed in <u>Telford</u>: "when a block of public funds is diverted en masse, the public must have access to records of the spending organization to determine how the funds were spent." <u>Telford</u>, 95 Wn. App. at 164 (citing <u>Weston v. Carolina Research and Dev. Found.</u>, 303 S.C. 398, 401 S. E. 2d 161, 165 (1991)). Fortgang's reliance on this single quote is misplaced. The statute at issue in <u>Weston</u> is broader than Washington's PRA. South Carolina's Freedom of Information Act applies to "'any organization, corporation, or agency supported in whole <u>or in part</u> by public

-14-

funds or expending public funds.'" <u>Weston</u>, 401 S. E. 2d at 163 (some emphasis

added) (quoting former S.C. CODE ANN. § 30-4-20(a) (1987)).

Washington's PRA contains no similar provision. Fortgang's reliance on

<u>Telford</u>'s reference to <u>Weston</u> ignores the rule consistently applied by Washington

courts following <u>Telford</u>—the government funding factor weighs in favor of applying the

PRA when the entity at issue receives the majority of its revenue from public funds.

<u>See, e.g.</u>, <u>Clarke</u>, 144 Wn. App. at 194-95. This factor weighs against applying the

PRA.

### Government Control[9]

---

[9] We note that under both federal and Connecticut case law, from which the <u>Telford</u> test derives, a private entity must be subject to <u>substantial</u> government control to be considered the functional equivalent of a government agency. <u>See</u> <u>Irwin Mem'l Blood Bank of S.F. Med. Soc'y. v. Am. Nat'l. Red Cross</u>, 640 F.2d 1051 (9th Cir. 1981); <u>Envtl. Systs. Corp. v. Freedom of Info. Comm'n</u>, 59 Conn. 753, 757 A.2d 1202, 1206 (2000). In <u>Irwin</u>, the Ninth Circuit concluded that the American Red Cross was not subject to FOIA despite possessing analogous attributes of government involvement present in this case. <u>Irwin</u>, 640 F.2d at 1057. The court stated that it is "substantial federal control that distinguishes those entities that can be fairly denominated as federal agencies under the FOIA from the organizations whose activities may be described as merely quasi-public . . . [A] private recipient of a federal grant is not an agency under the FOIA 'absent extensive, detailed, and virtually day-to-day supervision.'" <u>Irwin</u>, 640 F.2d at 1055 (quoting <u>Forsham v. Harris</u>, 445 U.S. 169, 180, 100 S. Ct. 977, 63 L. Ed. 2d 293 (1980)). Connecticut requires a similar showing of substantial government control:
> [T]o satisfy the regulation prong of the test, the entity must "operate under direct, pervasive or continuous regulatory control . . ." Also critical in the determination of whether an entity is a governmental agency is the amount of control the government exercises over the entity's detailed physical performance . . . .
> . . . . Because the government does not control the day-to-day activity of the plaintiff's business, the third prong of the functional equivalent test is not met.

This factor focuses on "the extent of government involvement or regulation."

Telford, 95 Wn. App. at 162. Fortgang contends several provisions indicate the City

"exercises more than enough control over the Zoo's operations. . . ." Br. of Appellant at

17.

Fortgang's control argument focuses almost exclusively on the agreement's

provisions to demonstrate the City's alleged substantial control over zoo operations.

For example, she argues that the City "prohibits the Zoo from using the City parkland . . .

for any purpose . . ." other than the uses spelled out in the contract and the Long Range

Plan. CP at 41.

> Required Use. WPZS shall use and continuously occupy the
> Property during the Term solely for the operation of a public zoological
> garden and related and incidental purposes and programs . . . in
> accordance with this Amendment and the Long Range Plan . . ."

CP at 41.

As the contract's preamble explains, the Zoo is located on real property owned by the

City. In accordance with the City charter, the City retained ownership of the "zoo

properties and facilities."

She also argues Zoo animal acquisition and disposal policies must comply with

City policies as required under the contract. She further claims contract provisions

---

Envtl. Sys. Corp. v. Freedom of Info. Comm'n, 59 Conn. 753, 757 A.2d 1202, 1206 (2000) (quoting Hallas v. Freedom of Info. Comm'n, 18 Conn. App. 291, 296, 557 A.2d 568 (1989)).

In Forsham v. Harris, 445 U.S. 169, 100 S. Ct. 977, 63 L. Ed. 2d 293 (1980), the United States Supreme Court addressed whether the acts of a private entity that received federal grants of federal funds became governmental acts subjecting that entity to the federal Freedom of Information Act. The court held that "absent extensive, detailed, and virtually day-to-day supervision," the entity was not a "federal instrumentality of a FOIA agency." Forsham 445 U.S. at 180.

-16-

impose numerous reporting requirements on the Zoo; the City controls the membership of three positions on the Zoo's Board, the Zoo's naming rights, and certain admission fee increases. Fortgang argues these provisions show governmental control. We disagree.

The City retains some oversight over WPZS via contract to ensure public accountability and contract compliance.[10] Read in context, the disputed provisions barely impinge on WPZS' exclusive authority to manage and operate the Zoo. Fortgang does not dispute that the agreement states, "WPZS shall exclusively manage and operate the Zoo. . . ." CP at 40. As the agreement's recitals explain, the City recognized the public benefit of a "creative partner" to improve and operate the Zoo for the public's benefit. CP at 54.

To achieve this goal, the City contracted with WPZS, recognizing that it was uniquely qualified to manage and operate the Zoo.

> WPZS is a non-profit public benefit corporation organized in 1965 for charitable, scientific and educational purposes for the study and promotion of zoology and wildlife conservation and for the education and recreation of the public. WPZS currently provides a limited range of services for the City's Parks Department at the Zoo, including educational programs and activities; wildlife and habitat conservation, marketing, management and operation of the Zoo food and gift services; and fundraising; . . .
> . . . [I]t would be in the best interest of the Zoo and its future development if the City were to enter into an agreement with WPZS to provide <u>for the management by WPZS of the entire Zoo operation . . .</u>

CP at 33, 35 (emphasis added).

---

[10] "As part of the management and operation contract, . . . the city shall provide for oversight of the managing and operating entity to ensure public accountability of the entity and its performance in a manner consistent with the contract." RCW 35.64.010(5).

The parties also intended WPZS to exercise its exclusive authority over the Zoo's management and operation by further defining the legal relationship of the parties as owner and contractor.

> The services to be rendered by WPZS . . . are as an independent contractor only and the relationship between the WPZS and the City is solely that of owner and contractor. Nothing contained in this Agreement shall be construed to create a partnership, joint venture, or a relationship of employment or agency.

CP at 341.

As this and other contract provisions demonstrate, these sophisticated contracting parties allocated various duties and responsibilities with the issue of control firmly in mind. For example, the City granted WPZS exclusive authority to manage and operate the Zoo. WPZS owns and cares for the Zoo animals. The City lacks authority over day to day Zoo operations. WPZS exercises complete control over its employees, setting price for admission, collecting and spending admission proceeds, and contracting vendors for visitor services. WPZS retains ultimate authority over whether to acquire or dispose of zoo animals. The agreement also grants WPZS broad discretion to implement alterations and improvement, such as new exhibits and support for visitor facilities.[11]

---

[11] The City retained certain rights related to its ownership of park lands and facilities. For example, the agreement requires WPZS to obtain approval before it moves "appurtenances, fixtures, improvements, equipment, additions, and other property attached to or installed in the [p]remises." CP at 48.

In Clarke, the court concluded that prohibiting private use of a rent-free municipally leased building indicates governmental control. We disagree however that limitations on the use of Zoo premises means government control. We are not persuaded that the City's contractual limitations in WPZS' use of city-owned land and facilities necessarily indicate government control. Under Telford's practical analysis, contract clauses like the ones here routinely impose limits on the use of land or

-18-

The agreement requires WPZS to comply with all federal, state, and local laws. This requirement is also true for any entity operating within the City. The agreement requires WPZS to operate the Zoo in accordance with American Zoo Association's policies (AZA).[12] But any zoo, public or private, must abide by these policies to maintain AZA accreditation.

Nor do various reporting requirements imposed by the agreement amount to governmental control.[13] As noted above, the agreement requires WPZS to provide several plans and reports to certain government entities. Financial reporting rules are a standard requirement for any government contractor receiving public funds. Reporting rules are not necessarily indicative of governmental control. See Dolan v. King County, 172 Wn.2d 229, 317, 258 P.3d 20 (2011). Further, these reports are not attached to any enforcement mechanism in the agreement, such as review or approval process. Most of these reports are merely "informational item[s]." CP at 3.

---

buildings rented or leased to another for valuable consideration. The mutual termination clauses here allow either party to terminate the agreement in the event of default by the other party.

"Moreover, a tenant located in a publicly owned structure on public land does not automatically become a public agency. Tenants located on municipally owned industrial parks, even when occupying publicly owned structures do not become public agencies."
Spokane Research & Defense Fund v. West Central Development Assoc., 133 Wn. App. 602, 606, 137, P.3d 120 (2006).

[12] AZA animal care standards followed by WPZS are developed by independent AZA committees. The City has no role in animal care policies.

[13] Our record shows Fortgang never made a public records request for the disputed documents from the City despite the City's alleged government control over WPZS.

We addressed a similar government control question in Sebek, 172 Wn. App. 273, 290 P.3d 159 (2012).[14] The plaintiff sued the City, arguing its payments to WPZS were illegal because WPZS' treatment of the elephants violated animal cruelty laws. Sebek, 172 Wn. App. at 276. The plaintiff alleged that WPZS is a de facto City agency or an arm of the City and should be prevented from taking alleged illegal acts related to its elephant program. We rejected this claim, reasoning that "[t]he question of whether [WPZS] operates as an 'arm' of [the City] or a 'de facto' part of [the City] turns on whether [the City] exerts a 'right of control' over [WPZS]." Sebek, 172 Wn. App. at 280 (citing Dolan v. King County, 172 Wn.2d 229, 258 P.3d 20 (2011)).[15]

We affirmed the trial court's dismissal of the plaintiff's lawsuit. Responding to the plaintiff's claim that "The City 'retains ownership and control' over the Zoo property," we rejected the claim explaining, the agreement makes it clear WPZS "shall exclusively manage and operate the Zoo" . . . animals "shall be the sole property of [WPZS]" and [WPZS] "shall assume all obligations . . . with respect to animals exhibited, housed . . . kept or cared for. . . ." We also rejected the plaintiff's claim that "the 'control provisions built into the agreement' show the City has control over the acts of the Zoo and its employees." Citing Dolan v. King County, 172 Wn.2d 229, 258 P.3d 20 (2011), we explained that the provisions cited by the plaintiff "do not give the City control over [Zoo] operations and . . . [t]he question of whether an entity operates as an 'arm' of a

_____

[14] Plaintiff Sebek is Fortgang's co-coordinator of Friends of Woodland Park Zoo Elephants, a group of community members. We are unpersuaded by Fortgang's attempt to distinguish Sebek from the present case. Indeed, we see no reason to apply a different analysis of government control to the facts presented here. Government control in Sebek considers the same indicia of control for purposes of the PRA analysis here.

governmental agency or a 'de facto" part of the government agency turns on whether the agency exerts a 'right of control' over the entity." Sebek, 172 Wn. App. at 279-80 (quoting Dolan, 172 Wn.2d at 312-13). We reasoned that unlike in Dolan, where the Supreme Court determined "stringent control over the defender organization" rendered it a de facto county agency, we concluded WPZS controlled what "exhibits are to be displayed, how they are to be displayed, what animals . . . to purchase" and their care. Sebek, 172 Wn. App. at 280.

Fortgang also argues City control over WPZS based on its right to appoint 3 of 38 WPZS Board members. The City lacks any veto power over the Board's actions or override authority relating to WPZS' countless discretionary zoo operation decisions. Unlike the present case, in Telford, the court summarily concluded that WSAC and WACO were "completely controlled by elected and appointed county officials. There is no private sector involvement or membership." Telford, 95 Wn. App. at 165.

In Clarke, the agreement permitted euthanasia services only in a manner approved by a government agency. Unlike the facts presented here, the government controlled euthanasia services, a core service, provided by the private animal control service provider. See Interlocal Cooperative Agreement Between the Cities of Richland, Pasco, Kennewick Washington for Animal Control, Section 3(e).

As discussed above, numerous provisions in the agreement weigh against government control over WPZS. Nothing Fortgang points to demonstrate sufficient City control over WPZS' exclusive authority to manage and operate the Zoo. The government control factor weighs against applying the PRA to the unique facts presented here.

Origin Factor

The final factor analyzes "whether the entity was created by government."
Telford, 95 Wn. App. at 162. The parties disagree on whether this factor applies to the Zoo or WPZS. Fortgang claims we must analyze the Zoo's origin, pointing to "the PRA's liberal construction requirement," the City's previous operation of the Zoo, and the Zoo's public-facility attributes. We disagree. Fortgang cites no persuasive authority that these considerations are relevant to the entity's origin.

It is undisputed that the government played no role in WPZS' creation. In 1965, a group of private citizens formed WPZS to support the zoo by, "promo[ting] public interest in and . . . encourag[ing] greater understanding of international wildlife . . . conservation and propagation," "stimilat[ing] interest in all aspects of [the Zoo]" and "motivat[ing] programs in keeping with educational scientific and aesthetic interests." CP at 177. WPZS has always remained a private nonprofit organization incorporated under Washington laws and registered with the Secretary of State as a charity. It reports to the Internal Revenue Service as a tax-exempt 501(c)(3) charitable organization. WPZS has been governed by an independent, volunteer board of directors throughout its 50 years of operation.

In Clarke, Division Three of this court held that TCAC, formed as a "private corporation, by private citizens," was not an entity created by the government thus, "this factor weighs against the P[R]A application." Clarke, 144 Wn. App. at 195. As in Clarke, we resolve this factor against application of the PRA to WPZS.

## Conclusion

On balance, the <u>Telford</u> factors weigh against concluding that WPZS is the functional equivalent of a government agency for purposes of applying the PRA. We affirm the trial court order granting WPZS' summary judgment motion.

WE CONCUR: