IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| LORI SHAVLIK and ARTHUR WEST, | ) | No. 79656-9-I |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| DAWSON PLACE, | ) | |
| | ) | FILED: November 25, 2019 |
| Respondent. | ) | |
| | ) | |

VERELLEN, J. — The Public Records Act, chapter 42.56 RCW (PRA),
extends both to government agencies and private entities that are the functional
equivalent of a government agency. Lori Shavlik and Arthur West (collectively
West) requested documents from the private nonprofit organization Child
Advocacy Center of Snohomish County at Dawson Place, but West does not
establish it is the functional equivalent of a government agency. The trial court
correctly concluded Dawson Place is not subject to the PRA.

West also fails to demonstrate the trial court abused its discretion by
denying his CR 56(f) motion to continue or by striking both a deposition transcript
that failed to comply with local rules and evidence he failed to authenticate.

We deny Dawson Place's motion for RAP 18.9 sanctions.

We affirm the summary judgment in favor of Dawson Place.

## FACTS

In early 2017, Shavlik and West submitted separate PRA requests to Dawson Place. Located in Everett, Dawson Place is a landlord to private and public entities that work with victims of child abuse, provides forensic interviewers to interview child abuse victims, and coordinates information-sharing meetings among entities that assist child abuse victims. Dawson Place responded it was not subject to the PRA. Shavlik and West each filed lawsuits, contending Dawson Place violated the PRA. The court consolidated the actions.

Dawson Place filed a motion for summary judgment and to strike some of West's previously filed evidentiary submissions. Less than two weeks later, West filed a motion for summary judgment. West filed a CR 56(f) motion to continue to transcribe a deposition and to conduct additional discovery based on the deposition. With the parties' agreement, the court took the matter under advisement to allow time to transcribe the deposition. After reviewing the deposition transcript, the court denied the motion to continue. The court granted the motion to strike and granted summary judgment for Dawson Place, concluding it was not subject to the PRA.

West appeals.

## ANALYSIS

### I. Whether Dawson Place is Subject to the PRA

West argues the court erred by concluding Dawson Place is not the functional equivalent of a public agency under the PRA. We review questions of

2

statutory interpretation and summary judgment rulings de novo, considering the evidence and any reasonable inferences in a light most favorable to the nonmoving party.[1]

The PRA "'is a strongly-worded mandate for open government'" and "'must be liberally construed'" to protect the public's interest in broad disclosure.[2] The PRA states, "Each agency . . . shall make available for public inspection and copying all public records" subject to certain exceptions.[3] An "agency" includes all "local agencies," which are defined broadly as "every county, city, town, municipal corporation, quasi-municipal corporation, or special purpose district, or any office, department, division, bureau, board, commission, or agency thereof, or other local public agency."[4] A private organization becomes subject to the PRA if it acts as the "functional equivalent" of a statutory "public agency."[5]

We determine whether an organization is the functional equivalent of a public agency under the PRA by weighing the Telford v. Thurston County Board of

---

[1] Fortgang v. Woodland Park Zoo, 187 Wn.2d 509, 518, 387 P.3d 690 (2017).

[2] Id. at 512 (internal quotation marks omitted) (quoting Rental Hous. Ass'n of Puget Sound v. City of Des Moines, 165 Wn.2d 525, 527, 199 P.3d 393 (2009); Yakima County v. Yakima Herald-Republic, 170 Wn.2d 775, 791, 246 P.3d 768 (2011) (quoting RCW 42.45.030)).

[3] RCW 42.56.070(1).

[4] RCW 42.56.010(1).

[5] Fortgang, 187 Wn.2d at 512.

Commissioners [6] factors.[7] West argues, though, Dawson Place is the equivalent of a public agency "regardless of the Telford factors."[8] In the recent case Fortgang v. Woodland Park Zoo, our Supreme Court held "[t]he Telford test is the proper analytical framework for evaluating a private or quasi-public entity's disclosure requirements under the PRA."[9] Because Fortgang controls our analysis and West relies on cases predating Fortgang, his argument is unpersuasive.

The purpose of the Telford test is to "identify private entities that have effectively assumed the role of government."[10]

> Under the Telford test, the factors relevant to deciding when a private entity is treated as the functional equivalent of an agency are (1) whether the entity performs a government function, (2) the extent to which the government funds the entity's activities, (3) the extent of government involvement in the entity's activities, and (4) whether the entity was created by the government.[11]

The factors do not need to be satisfied equally for an organization to be subject to the PRA.[12] PRA cases are highly fact-specific,[13] and past applications of the

---

[6] 95 Wn. App. 149, 974 P.2d 886 (1999).

[7] Fortgang, 187 Wn.2d at 513.

[8] Appellant's Br. at 17.

[9] Fortgang, 187 Wn.2d at 534.

[10] Id. at 526.

[11] Id. at 517-18.

[12] Clarke v. Tri-Cities Animal Care & Control Shelter, 144 Wn. App. at 185, 192, 181 P.3d 881 (2008) (citing Telford, 95 Wn. App. at 162).

[13] See Andrews v. Wash. State Patrol, 183 Wn. App. 644, 653, 334 P.3d 94 (2014) ("whether an agency complies with the PRA is a fact specific inquiry").

Telford test provide important guidance.[14] A survey of selected cases applying the Telford factors is instructive.

In Fortgang v. Woodland Park Zoo, the plaintiff sought records from the nonprofit contracted with the City of Seattle to run the Woodland Park Zoo.[15] The court applied the Telford factors and concluded the zoo was not subject to the PRA where three of the four factors weighed against functional equivalency.[16] First, the job of "zoo management" was not "an inherently governmental function" because it was not a task "that could not be delegated to the private sector."[17] Second, although 30 percent of the zoo's budget was from public sources, that money came from fixed annual allocations rather than reimbursable fees-for-service.[18] Because fixed annual allocations supported a conclusion of functional equivalency but "no Washington case concludes that an entity's funding supports PRA coverage in absence of majority public funding," this factor was inconclusive.[19] Third, the government did not exert day-to-day control over zoo operations, despite the presence of three government representatives on the 38-

---

[14] See, e.g., Fortgang, 187 Wn.2d at 525 n.7, 526 n.8, 528 n.11 (relying on foreign applications of the Telford factors); cf. Neighborhood All. of Spokane County v. Spokane County, 172 Wn.2d 702, 719-21, 261 P.3d 119 (2011) (approving reliance on federal open records jurisprudence to interpret and apply the PRA).

[15] 187 Wn.2d 509, 387 P.3d 690 (2017).

[16] Id. at 533.

[17] Id. at 524-26.

[18] Id. at 516, 527.

[19] Id. at 529.

member zoo board and various transparency and record-keeping requirements in the contract with Seattle.[20] The absence of governmental control over day-to-day zoo operations weighed against functional equivalency.[21] Fourth, the nonprofit contracted to run the zoo "was incorporated solely by private individuals, so [the court] could not attribute its 'origin' to special legislation or governmental action."[22] Because three factors weighed against functional equivalence and the other was inconclusive, the nonprofit was not subject to the PRA.[23]

In Clarke v. Tri-Cities Animal Care & Control Shelter, Division III of this court concluded an animal shelter was the functional equivalent of a public agency.[24] First, and most significantly, the animal shelter performed a nondelegable governmental function because its contract with local government let it exercise "police powers pursuant to state statute."[25] Second, "nearly all" of the shelter's operating budget came from public money, the government paid its rent, and its contract with the government prohibited it from doing any business other than animal control services.[26] Third, although the shelter was "in control of its day-to-day operations," the court concluded this factor supported functional

---

[20] Id. at 515, 530-31.

[21] Id. at 531.

[22] Id. at 532.

[23] Id. at 533.

[24] 144 Wn. App. 185, 181 P.3d 881 (2008).

[25] Id. at 193.

[26] Id. at 194-95.

equivalence because of "a notable degree of governmental control."[27] Clarke predates Fortgang, and it is clear Fortgang's requirement of governmental control over day-to-day operations constrains Clarke's reasoning on this factor. Fourth, because the animal shelter was a private corporation not created by the government, this factor weighed against functional equivalence.[28] Because, on balance, the factors favored functional equivalence, the animal shelter was subject to the PRA.[29]

Washington courts have also long relied on foreign case law as persuasive authority to analyze the PRA.[30] For example, the Telford court directly adopted its functional equivalency test from a Connecticut Supreme Court case.[31] Another Connecticut case, which our Supreme Court cited in Fortgang, Domestic Violence Services of Greater New Haven, Inc. v. Freedom of Information Commission,[32] provides guidance here.

An individual requested corporate documents, such as bylaws and budgets, from a domestic violence nonprofit organization pursuant to Connecticut's public

---

[27] Id. at 195.

[28] Id.

[29] Id.

[30] E.g., Fortgang, 187 Wn.2d at 525-26, 528, 530, 532 (citing foreign cases).

[31] Telford, 95 Wn. App. at 162-63 (citing Board of Trustees of Woodstock Academy v. Freedom of Info. Comm'n, 181 Conn. 544, 436 A.2d 266 (1980)).

[32] 47 Conn. App. 466, 704 A.2d 827 (1998).

7

records act.[33] The organization helped victims of domestic violence with shelter, counseling, and advocacy services.[34] Connecticut law required that the judiciary maintain family violence response and intervention units to address domestic violence cases and provide advocacy services. The judiciary contracted with a statewide nonprofit to provide services, and that nonprofit subcontracted with the domestic violence organization for local services.[35] Courts referred domestic violence victims to the organization for advocacy services.[36] The organization received 66 percent of its funding from federal, state, and local government.[37]

Applying factors identical to the Telford factors, the court concluded the organization was not a public agency.[38] First, the organization was not performing a nondelegable governmental function. Although preventing domestic violence and treating its victims was a governmental function, the organization had no power to make decisions affecting government programs that benefitted domestic violence victims. And the organization provided those services pursuant only to a private contract rather than being compelled to do so by statute.[39] Second, the funding factor was not met because the "substantial funds from government" came

---

[33] Id. at 467.

[34] Id. at 471.

[35] Id. at 472.

[36] Id.

[37] Id. at 471.

[38] Id. at 473, 478.

[39] Id. at 475.

from service contracts and government grants.[40] Third, the government control factor did not support functional equivalency. The regulatory and audit requirements imposed on the organization by the government did not make it the functional equivalent of an agency "[b]ecause government does not have day-to-day involvement in the [organization's] ongoing activities."[41] Fourth, the organization was not created by government.[42] Because none of the factors were met, the domestic violence organization was not subject to Connecticut's public records act.[43]

Here, West contends all four Telford factors show Dawson Place is the functional equivalent of a public agency.

A. Inherently Governmental Function

The first factor considers whether the organization performs inherently governmental functions or "functions that could not be delegated to the private sector."[44] An organization does not perform a government function merely because it contracts with the government pursuant to enabling legislation.[45]

West argues Dawson Place performs a nondelegable law enforcement function because of its contractual duties with Snohomish County, particularly the

---

[40] Id. at 476.

[41] Id. at 478.

[42] Id. at 478.

[43] Id.

[44] Fortgang, 187 Wn.2d at 524 (citing Telford, 95 Wn. App. at 165), 525.

[45] Id. at 525.

role its child interview specialists play in criminal investigations. This argument overstates Dawson Place's role in the criminal justice process and misstates the organization's mission.

Before the creation of Dawson Place, a child victim of physical or sexual abuse in Snohomish County "would have to go all over the county to find [treatment and law enforcement] services" which was "unduly burdensome on people and families that were already going through what was likely the most difficult time of their life."[46] Putting law enforcement, medical, and social services in a single location helps avoid revictimizing children by making them recount their abuse in multiple interviews with multiple people.[47] Accordingly, Dawson Place's bylaws state its mission is to "promote[ ] a coordinated multidisciplinary response to child physical and sexual assault in a safe, agency-neutral child-focused setting."[48]

Dawson Place advances its mission through three distinct, but related, activities. First, it is the landlord to five entities that lease about two-thirds of Dawson Place's building and work with victims of child abuse.[49] Dawson Place

---

[46] Clerk's Papers (CP) at 2276.

[47] Id. at 2276-77; see id. at 3877 ("By providing a single location and accredited interviewing services, [Dawson Place] reduce[s] the additional trauma that comes with seeking help after the initial trauma of the abuse."); RCW 26.44.175(1) ("The legislature finds that the purpose of multidisciplinary child protection teams . . . is to . . . coordinate the prompt investigation of . . . child abuse . . . to reduce the trauma of any child victim.").

[48] CP at 4074.

[49] The entities, two private and three public, are Providence Intervention Center for Assault & Abuse, which conducts forensic examinations for physical

pays property taxes on its building, pays the mortgage on its building, and manages the issues of being a landlord.

Second, Dawson Place coordinates information sharing on child abuse victims through multidisciplinary team meetings. Although RCW 26.44.180 mandates the use of multidisciplinary team meetings to investigate and address child sexual abuse, a child advocacy center is not necessary to comply with the law.[50] Dawson Place's executive director chairs all multidisciplinary team meetings. The executive director and her office staff schedule the meetings and invite attendees. Meeting attendees vary depending on the cases being discussed. Attendees could include law enforcement if the victim's case is being criminally investigated, it could include only medical providers, or it could be a mix.

---

and sexual abuse as well as providing victim advocacy services; Compass Health's Child Advocacy Program, which provides mental health counseling; the Snohomish County Sheriff's Office Special Investigations Unit, which investigates allegations of child abuse and neglect; the Snohomish County Prosecuting Attorney's Office's Sexual Assault Unit; and the Department of Social and Health Services Division of Children and Family Services.

[50] RCW 26.44.180(2) requires that every county develop protocols for handling investigations of criminal child abuse. Those protocols must "address the coordination of . . . the prosecutor's office, law enforcement, children's protective services, children's advocacy centers, where available, local advocacy groups, community sexual assault programs," and others. Former RCW 26.44.180(2) (2010) (emphasis added). Amendments made in 2019 to RCW 26.44.180(2) do not affect our analysis, but we note the legislature eliminated the comma between "centers" and "where." LAWS OF 2019, ch. 82, § 2. Similarly, RCW 26.44.185(1) requires that county protocols address coordination of child fatality, physical abuse, and neglect investigations between "prosecutor's offices, law enforcement, children's protective services, children's advocacy centers, where available, local advocacy groups, emergency medical services" and others. RCW 26.44.185(1) (emphasis added). Because child advocacy centers must be considered for investigation protocols only "where available," neither statute compels the creation of child advocacy centers or the use of child interview specialists at those centers.

Most significantly, the team meets only to discuss victims and does not make decisions about, for example, how to treat victims' medical needs, whether criminal charges are warranted, or how to handle a possible criminal case.[51]

Third, Dawson Place has two child interview specialists on staff who conduct forensic interviews with child victims. Dawson Place provides these services pursuant to a contract with Snohomish County. An interview can be requested by a child's private or public school teacher, medical providers, law enforcement officers, social workers, or others. Interviews are typically conducted at Dawson Place, which provides a child-friendly interview setting and makes emotional support dogs available to children being interviewed. The interviews are all recorded and may be used for a criminal investigation or prosecution. Interview specialists must, when requested, provide interview transcripts, work with prosecuting attorneys, and testify in court. Although one of the interview specialists' professional responsibilities is working "closely with deputy prosecuting attorneys and detectives to develop cases involving child victims or other victims with special needs,"[52] no evidence shows interview specialists do more than interview child victims and, when requested, perform related duties.

These three functions are not inherently governmental. At its core, Dawson Place advances the therapeutic process for child victims of physical and sexual abuse by coordinating communication among different entities that work with

---

[51] We note that West agreed during oral argument that the county prosecutor, not Dawson Place, decides whether to bring criminal charges.

[52] CP at 3424.

victims and by providing a single location for entities working to assist child victims. Abuse victims benefit from this work, as do law enforcement, social service agencies, and health care organizations. Being a landlord, arranging meetings, exchanging information on victims of abuse, and providing a meeting space are functions that can be performed by a public or private organization. And, for the reasons that follow, Dawson Place's interview specialists do not perform a nondelegable governmental function.

Washington has made child abuse prevention and child safety a "paramount" concern.[53] Dawson Place's work protects public health and safety by helping victimized children. But, like the organization in Domestic Violence Services of Greater New Haven, Dawson Place does not perform a nondelegable governmental function.[54]

Critically, Dawson Place has no control over investigatory and charging decisions because they are made exclusively by law enforcement or the prosecuting attorney. Although "child interview specialists are an integral part of

---

[53] See RCW 26.44.010 ("When the child's physical or mental health is jeopardized, or the safety of the child conflicts with the legal rights of a parent, custodian, or guardian, the health and safety interests of the child should prevail. When determining whether a child and a parent, custodian, or guardian should be separated during or immediately following an investigation of alleged child abuse or neglect, the safety of the child shall be the department's paramount concern."); see also RCW 26.44.175(1) ("The legislature finds that the purpose of multidisciplinary child protection teams . . . is to ensure the protection and well-being of the child and to advance and coordinate the prompt investigation of suspected cases of child abuse or neglect to reduce the trauma of any child victim.").

[54] See 47 Conn. App. at 474-75.

the investigative process," uncontested evidence shows police officers can conduct investigations without Dawson Place.[55] Without any involvement from Dawson Place, a police officer can investigate a crime against a child and the prosecuting attorney can bring charges based on the investigation. When there are no criminal allegations, Dawson Place often conducts forensic interviews to support therapeutic services. Just as law enforcement benefits from a hospital administering rape kits to sexual assault victims, law enforcement benefits from Dawson Place's mission and activities. But neither Dawson Place nor a hospital's emergency department necessarily performs a nondelegable governmental function because of their work.

In Clarke, the animal shelter performed a nondelegable governmental function because it took over some of the municipality's law enforcement functions for animal regulation, including the authority to unilaterally issue citations and seize private property.[56] Here, as in Domestic Violence Services of Greater New Haven, because the government retained the sole authority to perform its nondelegable law enforcement and prosecutorial functions and Dawson Place's

---

[55] According to former Snohomish County Prosecuting Attorney Mark Roe, his office "can't dictate to anybody in law enforcement what they must and must not do. Some kids are interviewed by an interview specialist, and some are not." CP at 2251. Dawson Place Executive Director Lori Vanderburg also explained, "There are other jurisdictions that have child interview specialists that [Snohomish County law enforcement officers] sometimes use. Sometimes detectives do their own interviews. . . . So given different circumstances and different agencies, they have different people that do interviews. Some of them, detectives, do their own, . . . [e]specially for teens." CP at 2566-67.

[56] 144 Wn. App. at 189-90.

14

services benefit abuse victims regardless of government involvement, the first Telford factor is not met.

B. Government Funding

The second Telford factor weighs the extent to which government funds the organization.[57] An organization is less likely the functional equivalent of an agency where it receives less than 50 percent of its funds from government.[58] More significant is whether government provides a fixed funding allocation or uses "an ordinary fee-for-services model" to provide funding.[59] The former favors functional equivalency and the latter does not.[60]

State, federal, and local government provided an average of 60 percent of all monies Dawson Place received from fiscal year 2010 through January 31, 2017.[61] Much of that government money was from 2010 and 2011 when Dawson

---

[57] Fortgang, 187 Wn.2d at 518.

[58] See id. at 529 ("[N]o Washington case concludes that an entity's funding supports PRA coverage in the absence of majority public funding.").

[59] See id. at 528 ("To the extent courts look beyond percentage and consider the nature of a public funding scheme, they hold . . . that a fee-for-services model weighs against functional equivalency even where an entity receives all or most of its funding from public sources.") (citing Domestic Violence Servs., 47 Conn. App. at 475-76; Envirotest Sys. Corp. v. Freedom of Info. Comm'n, 59 Conn. App. 753, 758-59, 704 A.2d 827 (2000)).

[60] Id. at 528-29.

[61] Dawson Place's total operating revenue over those years was $7,823,285, and, viewed in a light most favorable to nonmoving party West, $3,813,679 of that was from government grants. The "Organizational Funding Report" created by Dawson Place states that in 2010 it had over $1.7 million in "operating revenue" and only $93,945 in government grants. CP at 3883. But other documents, including a declaration and supporting documents from a Dawson Place board member, show that it received over $1 million in government funds that year. CP at 3858, 3860-61. It appears Dawson Place may have

Place received over $1.6 million from different government grants to buy and update its building. Since 2013, however, less than 50 percent of Dawson Place's revenue has come from government.[62]

No Washington case requires that we view an organization's funding history only as a mathematical average, and the parties agree no authority requires that we look at the entirety of an organization's history when analyzing the government funding factor. Fortgang's emphasis on the form of annual funding allocations— "i.e., designated levy funds, instead of fees for service"—reveals that our focus should be on routine funding, not one-time allocations.[63] Accordingly, we focus our analysis on the amounts and methods of Dawson Place's government funding in recent years.

---

mislabeled those large government grants in its funding report in the "operating revenue" category rather than the "government grants" category. Regardless, these differences are ultimately immaterial to our analysis.

[62] Total revenue was 32 percent of funding in fiscal year 2014, 24 percent in FY 2015, 35 percent in FY 2016, and 43 percent for the period between July 2016 and January 31, 2017. See CP at 3883, 4313.

[63] See Fortgang, 187 Wn.2d at 528-29. Of course, our focus on routine funding under these facts does not prevent courts from weighing one-time allocations where circumstances differ.

Excluding fee-for-services rental income,[64] less than 50 percent of Dawson Place's funding comes from government in a typical year.[65] The largest share routinely comes from Snohomish County. Since late 2013 or early 2014, Dawson Place's child interview specialists have been funded largely by Snohomish County pursuant to a services contract. Dawson Place pays for two child interview specialists, and the county reimburses it for their services. If Dawson Place fails to submit reimbursement claims within 90 days of providing services, then Snohomish County is not required to pay. Because less than 50 percent of Dawson Place's routine funds come from government and, more significantly, those funds are all part of a fee-for-services exchange, this factor weighs against a finding of functional equivalency.

## C. Extent of Government Control

We evaluate the extent of government control for a functional equivalency analysis by considering the degree of government control on "day-to-day operations."[66] The presence and extent of government regulation does not

---

[64] As the landlord to three government entities, Dawson Place receives money from government as rental income. The record does not separate the rental payments from government tenants and private tenants. Regardless, these payments are clearly a fee-for-services exchange.

[65] Thirty-two percent of Dawson Place's revenues came from government in fiscal year 2014, 24 percent in FY 2015, 35 percent in FY 2016, and 43 percent through January of FY 2017. See CP at 4314.

[66] Fortgang, 187 Wn.2d at 530 n.14, 531 (citing inter alia, Domestic Violence Servs., 47 Conn. App. at 477).

17

determine whether government exerts control over daily operations.[67] But the presence of government officials in positions of authority over the organization can show government control.[68]

West contends Dawson Place is subject to government control because "it operates pursuant to the express terms of State Law and County protocols adopted as required by State Law."[69] Specifically, West argues RCW 26.44.020, .180, and .185, interlocal agreements, and a federal memorandum of understanding (MOU) "explicitly control the function and operation of the center."[70] He is incorrect.

To the extent chapter 26.44 RCW affects daily operations at Dawson Place, these are regulatory impacts and not actual control. Also, these statutes require action by Snohomish County alone,[71] regardless of whether a statutory "child

---

[67] See id. at 530-531 ("There is no good reason to value government transparency more in a heavily regulated area than in a less regulated area. Nor is there any good reason for an entity to be subject to PRA transparency requirements because other laws (or contracts) already mandate a certain amount of transparency.").

[68] See Telford, 95 Wn. App. at 165 (concluding an organization was subject to government control where an association was "completely controlled by elected and appointment county officials," despite lacking any "outside government control.").

[69] Appellant's Br. at 28.

[70] Id. at 35.

[71] RCW 26.44.180(2)(a) ("Each county shall develop a written protocol."); RCW 26.44.185(1) (same).

advocacy center" exists.[72] And where, as here, a child advocacy center is available in the county, the statutes do not regulate the advocacy center's conduct. These laws do not show day-to-day governmental control.

West contends that a "pervasive scheme of interlocal agreements" control Dawson Place's daily operations,[73] but Dawson Place is not party to any interlocal agreements.[74] Nor could it be because private nonprofit corporations, like Dawson Place, cannot enter into interlocal agreements under the Interlocal Cooperation Act.[75]

West also distorts the record when he contends a "state-federal MOU[ ] . . . control[s] the function and operation of" Dawson Place.[76] He relies on an MOU between the Federal Bureau of Investigation and the National Children's Alliance,

---

[72] See RCW 26.44.185(1) (counties must create child sexual abuse investigation protocols and must consider the role of a child advocacy center only "where available").

[73] Appellant's Br. at 35.

[74] West asserts "Dawson Place is a party to Interlocal 'Agency' Cooperation Agreements with" Snohomish County and 11 municipalities, Appellant's Br. at 28 n.15, but the only "interlocal agreement" in the record is between Snohomish County and the City of Stanwood, not Dawson Place. CP at 3401. West's briefing cites to clerk's papers 3143 to 3278 as support for his interlocal agreement assertion, but the only evidence about interlocal agreements in that section of the record also refers to the interlocal agreement between Stanwood and Snohomish County.

[75] RCW 39.34.030(1) (authorizing interlocal agreements by any "public agency"); RCW 39.34.020(1) (defining "public agency" in relevant part as "any agency, political subdivision, or unit of local government of this state including, but not limited to, municipal corporations, quasi municipal corporations, special purpose districts, and local service districts").

[76] Appellant's Br. at 35.

19

which provides accreditation to child advocacy centers. Dawson Place is not a party to the MOU. And even if the MOU applied to Dawson Place through the National Children's Alliance, the memorandum does not give the FBI any operational control. Rather, it allows the FBI access to child advocacy center facilities so the FBI's own child interview specialists can interview abuse victims.

Dawson Place's board is also not a source of government control. Dawson Place's board and its executive director have control over daily operations. Dawson Place's bylaws are structured to ensure private individuals always comprise a majority of the board. Both at the time of its creation and recently, the majority of Dawson Place's board members are private individuals not employed by any government. In 2017, for example, Dawson Place had 17 board members, and seven were employed by a government entity. Only three of those seven represented government entities on the board.

Because West fails to show day-to-day government control over Dawson Place, this factor does not favor functional equivalency.

D. Government Origin

West argues we should conclude Dawson Place was created by the government because government employees were involved in its creation. Fortgang does not support this approach.[77] Fortgang does approve consideration of whether government action created the organization.[78] This puts two concepts

---

[77] Fortgang, 187 Wn.2d at 531 (rejecting an argument "that courts should . . . ask whether the government was involved in the entity's creation").

[78] Id. at 531-32.

in play. First, we consider whether the organization was created by special legislation.[79] As discussed, chapter 26.44 RCW neither creates nor mandates the creation of any child advocacy center. And Dawson Place was already formed when the legislature amended RCW 26.44.020, .180, and .185 to account for child advocacy centers. Second, we consider who actually incorporated the organization.[80] Dawson Place was incorporated by a private individual acting in his capacity as chief executive for private organization Compass Health. Because government action did not create Dawson Place, the fourth Telford factor does not support functional equivalency.

### E. The Telford Factors Do Not Support Functional Equivalency

Dawson Place supports a core governmental interest—protecting children from the harms of physical and sexual abuse—but does not do so by performing a nondelegable governmental function. Dawson Place is not primarily funded by government, is not controlled by government, and was not created by government. Dawson Place is not a "public agency" as defined in RCW 42.56.010(1).

### II. West's Motion to Continue

West also appeals denial of his CR 56(f) motion to continue. Dawson Place argues the invited error doctrine estops West from assigning error to denial of his motion. Under the invited error doctrine, "a party may not set up an error at trial

---

[79] Id.

[80] See id. at 532 ("But WPZS was incorporated solely by private individuals, so we cannot attribute its 'origin' to special legislation or other government action."); Clarke, 144 Wn. App. at 195 ("TCAC was formed as a private corporation, by private citizens, and is not an entity created by the government.").

and then complain of it on appeal."[81] The doctrine applies when a party takes "affirmative and voluntary action" that induces the trial court to take an action later challenged on appeal.[82]

During the hearing on the motion to continue, West asked the trial court to deny his continuance and proposed an alternative course of action.

> [W]hat I would like—what I've asked the court to do is rule against the [CR] 56(f) motion, allow me to take a technical exception to that, and allow the parties to file additional evidence as the court sees fit, including the deposition of Adam Cornell, to the extent that we may need it.
>
> . . . .
>
> But I would like to proceed forward today, if it all possible. . . .
>
> . . . .
>
> . . . I believe these issues can all be addressed by the court's issuing a memorandum opinion and considering the deposition of Adam Cornell and what further financial information is necessary within a week of today's hearing. That's what I would ask the court [to] order.[83]

The court did precisely as West suggested. It denied the continuance "except that the court agreed to take the matter under advisement so that the recent deposition of Mr. Adam Cornell might be transcribed and submitted in such parts as any party wished, provided the excerpts complied with local rules."[84]

---

[81] Grange Ins. Ass'n v. Roberts, 179 Wn. App. 739, 774, 320 P.3d 77 (2013).

[82] Id.

[83] RP (Oct. 31, 2017) at 19-20.

[84] CP at 999.

22

West now assigns error to the ruling, but the invited error doctrine precludes him from doing so. Thus, we decline to consider this issue.

## III. Dawson Place's Motions to Strike

West assigns error to the court's exclusion of evidence on summary judgment. West submitted several sets of documents labeled "Tables of Evidence."[85] He also submitted the entire transcript from Cornell's deposition and a "Declaration re Deposition Excerpts" after the court denied the motion to continue. Dawson Place made two motions, each on different grounds, to strike the submissions. We review a grant of a motion to strike evidence for abuse of discretion.[86]

The court excluded the "Tables of Evidence" because they "were not accompanied and authenticated by a declaration."[87] Evidence submitted on summary judgment must be admissible.[88] A party offering a document in evidence must authenticate it.[89] On summary judgment, CR 56(e) requires that evidence submitted be "[s]worn or certified" and either attached to or served with an affidavit. Alternatively, GR 13(a) allows submission of an unsworn statement in

---

[85] CP at 3705 (first "table"), 3665 (second "table"), 3647 (third "table").

[86] Burmeister v. State Farm Ins. Co., 92 Wn. App. 359, 365, 966 P.2d 921 (1998).

[87] CP at 1000.

[88] SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 141, 331 P.3d 40 (2014).

[89] Burmeister, 92 Wn. App. at 365 (citing ER 901).

lieu of an affidavit if it contains the proper recitation that it was made under penalty of perjury.

West's "Tables of Evidence" did not comply with CR 56(e) or GR 13(a). He provided dozens of documents in three submissions, each with a signed cover sheet that merely listed the attached documents and made no recitation of accuracy or authenticity. Because West failed to authenticate the documents he submitted, the court did not abuse its discretion by excluding them.[90]

The court also excluded the Cornell deposition transcript and related submissions provided in support of West's summary judgment motion because they violated Snohomish County Superior Court Local Rule 7(b)(2)(d)(4). LCR 7(b)(2)(d)(4) requires that deposition testimony submitted in support of a motion be "quoted verbatim" or that "relevant pages thereof . . . be attached to the motion." The court's oral ruling taking the CR 56(f) motion under advisement to review the transcript reflected this rule. The court told the parties, "If there's something [significant] in this deposition transcript . . . identify that for me so I can quickly and easily find it."[91] But West provided paraphrased selections from the deposition instead of verbatim quotations and attached the entire 125-page deposition transcript instead of the "relevant pages thereof." "Local rules for the conduct of

---

[90] West also contends ER 201 mandated the court's acceptance of certain legislative and judicial documents. But ER 201(d) requires judicial notice only "if requested," and he never made a request.

[91] RP (Oct. 31, 2017) at 26.

trial courts are desirable and necessary; such rules should not be ignored."[92] Because West clearly did not comply with the local rule, the court did not abuse its discretion by excluding this evidence.[93]

## IV. Dawson Place's Motion For Sanctions Under RAP 18.9

Dawson Place urges us to sanction West for making arguments in his appellate briefs without citations to the record or to legal authority. West's briefs contain numerous errors and omissions but are not so inadequate to warrant sanctions.

Therefore, we affirm the trial court's determination that Dawson Place is not subject to the PRA and deny Dawson Place's motion for sanctions on appeal.

WE CONCUR:

_____

_____

_____

---

[92] Lemon v. Lemon, 59 Wn. App. 568, 574, 799 P.2d 748 (1990).

[93] See Allied Fin. Servs., Inc. v. Mangum, 72 Wn. App. 164, 169, 864 P.2d 1 (1993) (affirming exclusion of witnesses for violation of discovery order enforcing a local court rule); see also Carlson v. Lake Chelan Cmty. Hosp., 116 Wn. App. 718, 737-41, 75 P.3d 533 (2003) (affirming exclusion of testimony under CR 26(g) for violations of discovery rules).