# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STEVE HORVATH, | DIVISION ONE |
| Appellant, | No. 85636-7-I |
| v. | PUBLISHED OPINION |
| DBIA SERVICES DBA METROPOLITAN IMPROVEMENT DISTRICT, | |
| Respondent. | |

DWYER, J. — Steve Horvath appeals from the orders of the superior court denying his motion for summary judgment and granting DBIA Services' motions for summary judgment and declaratory judgment. On appeal, Horvath asserts that the trial court erred in determining that DBIA Services was not the functional equivalent of a governmental entity under the Public Records Act[1] with regard to his records request. Because the trial court did not abuse its discretion in its balancing of the multi-factor "functional equivalent" test, Horvath's assertion fails.

Accordingly, we affirm.

I

In 1958, several private individuals filed articles of incorporation in this state to create a nonprofit corporation named the Central Association of Seattle. The Association's goal was to

---

[1] Ch. 42.56 RCW.

further and promote the development, beautification and improvement of the City of Seattle, and particularly the central area thereof, so that said city can more adequately, effectively, efficiently and pleasantly serve the residents of King County, the state of Washington, and all other persons having occasion to come to the city of Seattle.

In 1971, our legislature enacted a bill authorizing a percentage of business owners located within a geographic area of a qualifying municipality to petition the municipality to provide specified parking and business improvement services in that area.[2] The bill authorized those municipalities to adopt a resolution designating that geographic area as a parking and business improvement area and to impose a special assessment levy against businesses and projects located within that area.[3] The bill further provided that, after a public hearing on that resolution, the municipality could then adopt an ordinance setting forth, in conformance with the services specified in the business owners' initiation petition, those services on which the revenues from that levy would be spent and imposing a special assessment levy to collect revenues to fund the provision of such services.[4] The bill expressly required that municipalities spend those revenues on the specific services identified in the parking and business improvement area ordinance.[5]

---

[2] LAWS of 1971, ch. 45, § 3. The bill also allowed qualifying municipalities to pass a resolution to initiate the parking and improvement area designation process. LAWS of 1971, ch. 45, § 3.

[3] LAWS of 1971, ch. 45, § 3-4.

[4] LAWS of 1971, ch. 45, § 10.

[5] LAWS of 1971, ch. 45, § 12 ("The special assessments levied hereunder must be for the purposes specified in the ordinances and the proceeds shall not be used for any other purpose.").

As pertinent here, in April 1999, a group of business owners in an area of downtown Seattle submitted a petition to the City of Seattle (the City) requesting that it provide certain business improvement services within that downtown area.

Several months later, representatives of the Central Association of Seattle, now renamed the Downtown Seattle Association, filed articles of incorporation for a subsidiary nonprofit corporation, to be named DBIA Services. The articles of incorporation stated that the Association's subsidiary was incorporated to provide certain services "to improve business conditions within business improvement areas in Seattle."

Thereafter, in early June 1999, the Seattle City Council passed a resolution indicating its intent to designate the petitioned area of downtown Seattle as subject to a special assessment levy for the purpose of funding the requested business improvement services therein.[6] Two months later, the City adopted an ordinance identifying that area as the "Downtown Parking and Business Improvement Area," authorizing a five-year special assessment levy against applicable businesses and projects in that area, creating a separate fund for the revenues generated by that levy, and mandating that revenues deposited into the fund be spent only in furtherance of the specifically identified business improvement services set forth in the petition.[7] The ordinance also authorized the "Director," a city employee, to administer the special assessment program,

---

[6] Seattle Resolution 29966 (June 7, 1999), https://clerk.seattle.gov/search/resolutions/29966 (last visited June 20, 2024).

[7] Seattle Ordinance 119541, §§ 1-2, 10 (July 26, 1999), http://www.clerk.ci.seattle.wa.us/search/ordinances/119541 (last visited June 20, 2024). The ordinance also identified the area in question as the "Business Improvement Area," and the BIA.

established an advisory board comprised of ratepayers from the downtown area subject to the special assessment (a board which would meet periodically and make certain recommendations to the City), and authorized the Director to sign a contract with a program manager—recommended by vote of the special assessment area ratepayers—which would oversee the day-to-day provision of the authorized services within the designated area.[8]

The ordinance also set forth that the Seattle City Council intended, for the initial year of the special assessment levy, that the Director contract with the Downtown Seattle Association to provide program management services within the designated area for a period of one year.[9]  After that, the ordinance provided, whether the Director would again contract with the Association would depend on the special assessment area ratepayers' recommendation that the Director continue to do so.

Thereafter, between 2000 and 2003, the special assessment area ratepayers recommended each year that the Director contract with the Association to provide the relevant services.  The Association agreed and, during that time, continued to seek reimbursement from the City for its provision of such services.

In 2004, the Seattle City Council adopted another ordinance, which disestablished the 1999 business improvement area, identified another area of downtown Seattle as the Metropolitan Improvement District (MID), and

---

[8] Seattle Ordinance 119541, §§ 1-2, 10.
[9] Seattle Ordinance 119541, § 13.

established a new 10-year special assessment therein.[10]  As applicable here, the 2004 ordinance operated similarly to the 1999 ordinance and stated that, "[i]t is the intent of the City Council that the Director renew the contract with the Downtown Seattle Association (DSA), and its management subsidiary, DBIA Services."[11]  Thereafter, between 2004 and 2013, the special assessment area ratepayers again recommended each year that the Director contract with DBIA Services to provide the improvement services within that area, and DBIA Services did so, continuing to seek reimbursement from the City for such services.

In 2013, the Seattle City Council adopted the ordinance that created the business improvement area in question.[12]  That ordinance, similar to the prior ordinance, disestablished the existing business improvement area, identified a specific area of downtown Seattle as the Metropolitan Improvement District, identified the services to be provided in that area, and established a 10-year special assessment therein.  The services identified in the ordinance included supplemental cleaning services, safety outreach, hospitality, supplemental law enforcement, marketing and communications services, business development

---

[10] Seattle Ordinance, 121482 (May 26, 2004), http://www.clerk.ci.seattle.wa.us/search/ordinances/121482 (last visited June 20, 2024).

[11] Seattle Ordinance 121482, § 13.

[12] Seattle Ordinance, 124175 (May 14, 2013), http://www.clerk.ci.seattle.wa.us/search/ordinances/124175 (last visited June 20, 2024).  A subsequent ordinance adopted in 2013, Ordinance 124235, amended the original ordinance to correct several drafting errors, which, according to DBIA Services, are not relevant to the issues on appeal.  In addition, in 2023, the City reauthorized the MID for another 10 years.  The parties agree that the 2013 Ordinance applies to this case.

and market research services, and transit, bike, and parking services and management.

The 2013 ordinance again indicated the Seattle City Council's intent that the Director renew DBIA Services' contract to "manage the day-to-day operations of the MID and to administer the projects and activities."[13]  Thereafter, through the time in question, the special assessment area ratepayers continued to annually recommended that the City contract with DBIA Services, the Director so contracted, DBIA Services provided the authorized services, and DBIA Services sought reimbursement from the City for its provision of those services, which the City dutifully disbursed to DBIA Services.

Thereafter, more than eight years after the City adopted the business improvement area ordinance in question, Horvath submitted a public records request to the Seattle Office of Economic Development, seeking public records regarding the Metropolitan Improvement District.  The City provided Horvath with certain responsive records and indicated that it did not have records that were responsive to the remainder of his request.

Horvath later sent an e-mail to the chief operating officer of the Downtown Seattle Association with the subject line "[Metropolitan Improvement District Business Improvement Area] Public Disclosure Request."  Horvath's e-mail indicated that he was redirecting his public records request from the City to the Association on the basis that the nonprofit was "a responsible party working on behalf of the [Metropolitan Improvement District Business Improvement Area] in

---

[13] Seattle Ordinance 124175, § 17.

your role as [Downtown Seattle Association's Chief Operating Officer]." Attached to Horvath's e-mail was a document setting forth requests for documents separated into two sections, "Items for City of Seattle" and "Items for [Downtown Seattle Association]."

The Association's chief operating officer responded to Horvath's e-mail and stated that the Association was not a public agency subject to the Public Records Act. Nevertheless, over the next nine months, the Association voluntarily provided over 100 documents to Horvath in four installments. Thereafter, the Association notified Horvath that it would not be sending "any documents or information in response to the request for compensation information" regarding the Association's employees.

Horvath then filed a complaint in King County Superior Court, with the defendant captioned as "DBIA SERVICES DBA METROPOLITAN IMPROVEMENT DISTRICT." Horvath alleged that the Metropolitan Improvement District, "a 'business improvement area' that covers much of downtown Seattle," had failed to comply with the Public Records Act. Horvath argued that the Metropolitan Improvement District was the functional equivalent of a governmental entity and that the District had violated the Public Records Act in responding to his public records request.[14] DBIA Services later filed a motion for summary judgment dismissal and a motion for declaratory judgment, arguing that DBIA Services was not a governmental entity for the purpose of the Public

---

[14] Horvath did not allege that the Downtown Seattle Association or DBIA Services had violated the Public Records Act but, rather, focused his allegations and arguments on what he characterized as the Metropolitan Improvement District.

7

Records Act. Horvath also filed a motion for summary judgment against DBIA Services arguing that the Metropolitan Improvement District violated the Public Records Act and requesting that the court impose monetary penalties against the District. The parties agreed "that no contested issues of material fact prevent summary judgment and that the Court should resolve on summary judgment the issue whether Defendant is subject to the Public Records Act, chapter 42.56 RCW ('PRA')."

The trial court granted DBIA Services' motions and denied Horvath's motion. In so doing, the court issued an extensive written order concluding that the Metropolitan Improvement District was a geographic area, not an actor capable of creating or possessing records, and that DBIA Services was not the functional equivalent of a governmental entity for the purpose of Horvath's public records request.

Horvath now appeals.

## II

Horvath asserts that the trial court erred in determining that DBIA Services was not the functional equivalent of an agency for the purpose of his Public Records Act request. Horvath is incorrect.

## A

As an initial matter, both of the parties in this matter assert that the trial court's summary judgment orders should be reviewed de novo. For the following reasons, we disagree.

Our Supreme Court has stated as follows:

As a general rule, we review summary judgment orders de novo and engage in the same analysis as the trial court. Keck [v. Collins], 184 Wn.2d [358, ]370[, 357 P.3d 1080 (2015)]; Crisostomo Vargas v. Inland Wash., LLC, 194 Wn.2d 720, 728, 452 P.3d 1205 (2019). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c).

Borton & Sons, Inc. v. Burbank Props., LLC, 196 Wn.2d 199, 205, 471 P.3d 871 (2020) (alteration in original). Nevertheless, the court continued, the summary judgment "standard of review depends on the question presented." Borton & Sons, 196 Wn.2d at 206. For instance, the court instructed, appellate courts apply the abuse of discretion standard of review when considering a case decided on summary judgment when the trial court had discretion in making its determination. Borton & Sons, 196 Wn.2d at 206 (trial court had discretion in determining whether to confer an equitable grace period at summary judgment (citing SAC Downtown Ltd. P'ship v. Kahn, 123 Wn.2d 197, 204, 867 P.2d 605 (1994))); see also Cornish Coll. of the Arts v. 1000 Va. Ltd. P'ship, 158 Wn. App. 203, 221, 242 P.3d 1 (2010) (trial court had discretion in determining whether to grant specific performance at summary judgment) (citing SAC Downtown Ltd. P'ship, 123 Wn.2d at 204). Accordingly, in this matter, the standard of review depends on the question that the parties presented to the trial court at summary judgment.

Here, the parties asked the trial court to determine whether DBIA Services was the functional equivalent of a public agency for the purpose of Horvath's records request under the Public Records Act. Because, as set forth below, asking a trial court to apply the "functional equivalent" test constitutes a request

9

for the trial court to exercise its discretion, the standard of review applicable to this question is that of abuse of discretion.

Our Supreme Court has identified a certain circumstance in which our legislature has intended to confer discretion to trial courts in construing an enactment: when the legislature expressly provides that an enactment be broadly construed but does not provide further guidance as to the manner in which such provisions are to be construed.  Yousoufian v. Off. of Ron Sims, 168 Wn.2d 444, 465, 229 P.3d 735 (2010) ("noting the Consumer Protection Act [chapter 19.86 RCW] 'provide[d] no specific indication of how attorney fees [were] to be calculated,' but exhorted courts 'to liberally construe the act, "that its beneficial purposes may be served".'" (quoting Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 594, 675 P.2d 193 (1983))).  In that circumstance, appellate courts have

> frequently set forth multifactor frameworks to provide guidance to trial courts exercising their discretion so as to render those decisions consistent and susceptible to meaningful appellate review.  See, e.g., Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 595, 675 P.2d 193 (1983) (adopting an analytical framework to calculate reasonable attorney fees under the Consumer Protection Act, chapter 19.86 RCW); Glover v. Tacoma Gen. Hosp., 98 Wn.2d 708, 717, 658 P.2d 1230 (1983) (identifying factors as proper considerations for trial judges to use in determining whether settlement agreements involving multiple defendants and contributory fault are "reasonable" under RCW 4.22.060), overruled on other grounds by Crown Controls, Inc. v. Smiley, 110 Wn.2d 695, 756 P.2d 717 (1988).

Yousoufian, 168 Wn.2d at 465.

Our Supreme Court has identified the Public Records Act as one such circumstance.  For instance, in Yousoufian, our Supreme Court interpreted the

10

act, found that it did not provide adequate guidance to trial courts in the exercise of their discretion, and, in response, adopted a multi-factor balancing test to aid trial courts in their calculation of monetary penalties resulting from a violation of that act:

> Here, as mentioned, the PRA provides no specific indication of how a penalty is to be calculated. It does, however, provide a "strongly worded mandate for broad disclosure of public records." Hearst Corp.[ v. Hoppe], 90 Wn.2d [123, ]127[, 580 P.2d 246 (1978)]. The PRA directs us to liberally construe it "to assure that the public interest will be fully protected." RCW 42.56.030. Its command is unequivocal: "Responses to requests for public records *shall be made promptly by agencies* . . . ." RCW 42.56.520 (emphasis added). Additionally, where the PRA is violated, trial courts *must* award penalties "at not less than $5 [per day] but not more than $100 [per day]." Yousoufian[ v. Office of King County Executive], 152 Wn.2d[ 421,] 433, 98 P.3d 463 (2004). The PRA is a forceful reminder that agencies remain accountable to the people of the State of Washington:
>
> > The people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created. This chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy and to assure that the public interest will be fully protected. In the event of conflict between the provisions of this chapter and any other act, the provisions of this chapter shall govern.
>
> RCW 42.56.030. It is therefore proper for us to identify factors that trial courts may appropriately consider in determining PRA penalties.

168 Wn.2d at 465-66 (second alteration in original). In so doing, our Supreme Court identified that the enactment had conferred discretion to trial courts with regard to penalty determinations and the court instructed that an abuse of

discretion standard of review was appropriate for reviewing such determinations. Yousoufian, 168 Wn.2d at 458-59.[15]

As applicable here, the "functional equivalent" test applied by the trial court in this matter also arose from our interpretation of the Public Records Act. With regard to that test, our Supreme Court has stated as follows:

> The PRA is "a strongly-worded mandate for open government," Rental Hous. Ass'n of Puget Sound v. City of Des Moines, 165 Wn.2d 525, 527, 199 P.3d 393 (2009), that "must be 'liberally construed . . . ' to ensure that the public's interest [in broad disclosure] is protected[.]" Yakima County v. Yakima Herald–Republic, 170 Wn.2d 775, 791, 246 P.3d 768 (2011) (quoting RCW 42.45.030). Our Court of Appeals has therefore interpreted the statutory word "agency" to include private entities when they act as the functional equivalent of government agencies. In Telford v. Thurston County Bd. of Commissioners, 95 Wn. App. 149, 162-63, 974 P.2d 886 (1999), Division Two of the Court of Appeals adopted a four-factor test to determine whether a private or quasi-private entity is an "'agency'" for purposes of the PRA. The other two divisions later adopted that "Telford test."[16]

Fortgang v. Woodland Park Zoo, 187 Wn.2d 509, 512-13, 387 P.3d 690 (2017) (first alteration in original) (footnote omitted). The court then approved of the "functional equivalent" test as "an appropriate way to decide whether a private entity must comply with PRA disclosure requirements." Woodland Park Zoo, 187

---

[15] Although agency action under the Public Records Act is generally reviewed de novo, RCW 42.56.550(3), we have recognized that certain trial court determinations related to the act are reviewed for abuse of discretion. See, e.g., Yousoufian, 152 Wn.2d at 430-31 (citing King County v. Sheehan, 114 Wn. App. 325, 350-51, 57 P.3d 307 (2002)) ("the trial court's determination of appropriate daily penalties is properly reviewed for an abuse of discretion"); Sanders v. State, 169 Wn.2d 827, 866-67, 240 P.3d 120 (2010) (abuse of discretion for reviewing the trial court's determination concerning the amount of award of costs and attorney fees arising from violation of the enactment); see generally Cedar Grove Composting, Inc. v. City of Marysville, 188 Wn. App. 695, 724-33, 354 P.3d 249 (2015) (reviewing trial court's determinations as to daily monetary penalties and award of attorney fees for abuse of discretion).

[16] See, e.g., Cedar Grove Composting, Inc., 188 Wn. App. at 720 (Division One); Spokane Rsch. & Def. Fund v. W. Cent. Cmty. Dev. Ass'n, 133 Wn. App. 602, 609, 137 P.3d 120 (2006) (Division Three).

12

Wn.2d at 513.[17] Notably, however, in approving of the use of, and applying, the "functional equivalent" test, neither our Supreme Court nor the three divisions of this court have substantially analyzed the question of the proper standard of review of a trial court's determination in reliance on that multifactor balancing test.

Nevertheless, given the foregoing, we conclude that abuse of discretion is the proper standard of review for a trial court's determination regarding whether a private entity is an "agency" under the Public Records Act. Our Supreme Court has repeatedly recognized that our legislature intended for the Public Records Act to be broadly construed. See, e.g., Woodland Park Zoo, 187 Wn.2d at 512; Yakima Herald-Republic, 170 Wn.2d at 791; Rental Hous. Ass'n of Puget Sound, 165 Wn.2d at 527. Division Two of this court, cited approvingly by our Supreme Court, recognized that the legislature did not provide further guidance to courts as to whether it intended for the term "agency" "to include or exclude" private entities from the public records laws. Telford, 95 Wn. App. at 161-63); see also Woodland Park Zoo, 187 Wn.2d at 513 (citing Telford 95 Wn. App. at 162-63). In response to that absence of guidance, Washington appellate authority adopted the "functional equivalent" test, a multi-factor balancing test for trial courts to apply. Furthermore, our Supreme Court has recognized that the legislature intended to confer discretion to the trial court in construing certain of the Public Records Act's provisions that did not provide guidance to the courts as to the

---

[17] Our Supreme Court also explained that the "functional equivalent" test "is not designed to sweep within Public Records Act coverage every private organization that contracts with government. This remains true even if the contracts in question are governed or authorized by statute." Woodland Park Zoo, 187 Wn.2d at 532.

manner in which those provisions should be construed. See Yousoufian, 168 Wn.2d at 465.

Given all of this, it is a reasonable reading of the act that the legislature intended to confer discretion to the trial court in determining whether a private entity is an "agency" pursuant to the act. Thus, the question for the trial court in its "agency" determination is a discretionary one, arising from the court's consideration of a multifactor balancing test. Accordingly, the standard of review for such a trial court determination is abuse of discretion.

B

"A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons." O'Dea v. City of Tacoma, 19 Wn. App. 2d 67, 85, 493 P.3d 1245 (2021) (citing Yousoufian, 168 Wn.2d at 458).

> "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard."

In re Dependency of Z.A., 29 Wn. App. 2d 167, 192, 540 P.3d 173 (2023) (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). In addition, "'[a] judge abuses his discretion when no reasonable judge would have reached the same conclusion.'" State v. Comcast Cable Commc'ns Mgmt., LLC, 16 Wn. App. 2d 664, 676, 482 P.3d 925 (2021) (quoting Sofie v. Fibreboard Corp., 112 Wn.2d 636, 667, 711 P.2d 711, 780 P.2d 260 (1989)). Furthermore, "'[a]n unchallenged finding of fact is a verity on appeal.'" Nearing v. Golden State

Foods Corp., 114 Wn.2d 817, 818, 792 P.2d 500 (1990) (quoting Metro. Park

Dist. v. Griffith, 106 Wn.2d 425, 433, 723 P.2d 1093 (1986)).

With regard to the "functional equivalent" test, our Supreme Court has

instructed that,

> the factors relevant to deciding when a private entity is treated as the functional equivalent of an agency are (1) whether the entity performs a government function, (2) the extent to which the government funds the entity's activities, (3) the extent of government involvement in the entity's activities, and (4) whether the entity was created by the government. Clarke v. Tri-Cities Animal Care & Control Shelter, 144 Wn. App. 185, 192, 181 P.3d 881 (2008) (citing Telford, 95 Wn. App. at 162). Courts applying the test consider whether "the criteria on balance . . . suggest that the entity in question is the functional equivalent of a state or local agency." Id.

Woodland Park Zoo, 187 Wn.2d at 517-18.

C

Here, the trial court issued a 12-page order setting forth its findings of fact

and conclusions of law with regard to the "functional equivalent" test. The trial

court noted that the parties did not contend that a genuine issue of material fact

existed at summary judgment. The parties do not dispute the trial court's findings

on appeal.

With regard to whether DBIA Services performs a government function,

the trial court found and concluded as follows:

> DBIA Services does not perform functions unique or essential to government. Providing and arranging the services and activities to support beautification, hospitality, entertainment, retail trade, maintenance, security, transportation, and parking within the boundaries of the MID is not an inherently governmental function like running an urban zoo is not a core government function. See Fortgang v. Woodland Park Zoo, 187 Wn.2d 509 (2017). Plaintiff

15

concedes that business development efforts are not inherently governmental functions. Plaintiff's Reply 3. Plaintiff's strongest argument that DBIA Services performs a "core" government function relates to policing, because DBIA Services engages Seattle Police Department ("SPD") for supplemental enforcement activities (including "emphasis patrols") in the boundaries of the MID. On its face, Plaintiff's argument acknowledges that DBIA Services is not *doing* the enforcement—unlike the entity in Clarke v. Tri-Cities Animal Care & Control Shelter, 144 Wn. App. 185 (2008), which performed animal control services, including enforcement activities implicating due process—because, in this case, SPD itself is performing the services. SPD is the government agency exercising police powers. DBIA Services arranges for additional enforcement by SPD, it does not displace SPD as the entity responsible for the policing activities. See Shavlik v. Dawson Place, 11 Wn. App. 2d 250[, 452 P.3d 1241] (2019) (conducting forensic interviews not inherently governmental where investigatory and charging decisions remained exclusively with law enforcement agencies). See also Decl. of Elisabeth James in Support of DBIA Services' Motion for Summary Judgment, Exhibit H (Contract with SPD).

Similarly, the City—not DBIA Services—assesses and collects funds from persons located in the MID. The City controls the assessment process. The City, not DBIA Services, may audit Ratepayers. The City pays expenditures from its dedicated MID account when invoices are submitted, including invoices submitted by the DBIA Services as the Program Manager. These governmental finance functions remain with the City.

Thus, the undisputed facts show that the primary government functions raised by Plaintiff are not, in fact, performed by DBIA Services but remain with the government. The Court is not persuaded that DBIA Services performs traditional governmental functions, i.e. inherently public functions that may not be delegated. This factor strongly weighs against functional equivalency.

Concerning the extent to which the City of Seattle funds DBIA Services,

the trial court found and concluded as follows:

Two considerations are generally material to an inquiry into government funding: the percentage of funding from public funds and the nature of the funding. See Fortgang, 187 Wn.2d at 527-528. Here, the majority—but not all—of DBIA Services' funding comes from MID assessments. Based on their submissions, the parties generally agree that in both 2021-2022 and 2022-2023,

16

approximately 93% of DBIA's funding came from MID ratepayer assessments.  Other sources of income include private donations and other fees for services.  In Washington, when the funds attributable to public sources are in the majority, this consideration weighs in favor of PRA coverage.  Id., citing Cedar G[r]ove, Clarke, and Telford.  DBIA Services argues that, in this case, the Court should consider whether this consideration truly weighs in favor of government equivalency because the source of public funds is not general funds but assessments specifically authorized and intended to provide for services in the MID, i.e., the assessments are from, and for the benefit of, ratepayers in the MID.  The Court is not persuaded that this distinction justifies a different calculus in the context of the Telford analysis.  The percentage-of-funding component of this factor weighs in favor of PRA coverage.

As to the nature of the funding, the facts establish a fee-for-services model, not a fixed allocation funding scheme.  In other words, the government funds collected by the City by assessment are only paid to DBIA Services for services rendered.  See Fortgang at 528, note 11, citing Domestic Violence Servs. [o]f Greater New Haven, Inc. v. Freedom of Information Commission, 704 A.2d 827 (Conn. App. 1998) (even though entity received "substantial funds" from local, state, and federal government, the funds were fees for services, in the form of grants, and therefore did not weigh in favor of functional equivalency), and Envirotest Systems Corp. v. Freedom of Information Com'n, 757 A.2d 1202 (Conn. App. 2000) (amount of government funding irrelevant where payment is fee-for-services pursuant to contract; in such cases, the funding factor weighs against a finding of functional equivalency).  As demonstrated in Envirotest Systems, a model is considered "fee-for-services" when payments made to the entity at issue are in consideration for the services it provided pursuant to a contract for the administration of a program.  In contrast, block grant funding was present in Telford where the agency's funds were collected via dues based on an annual operating budget and were paid *before* services were rendered.  See Telford, 985 [Wn]. App. at 164.  Here, the City does not simply transfer all assessed funds to DBIA Services; rather, the Director pays out portions of the funds as DBIA Services submits invoices reflecting services that have been performed over a specified period, including its own services.  Plaintiff's Corrected Motion 16: 11-18 ("The MID is required to submit documentation of allowable expenses to the City's Finance Director for review . . . . [T]he City reimburses the MID for broad expenditure categories such as 'salaries and benefits'; 'professional services'; general and administrative'; and 'program expenses.[']"), citing Horvath Declaration, Exhibits 7 and 8.  This reimbursement system represents a fee-for-services model, which weighs against

functional equivalency. See Fortgang, 187 Wn.2d at 528. Additionally, DBIA Services receives no benefits from the City such as use of a government building, insurance, or employee benefits.

The Supreme Court stated that the percentage-of-funding consideration is the foremost consideration to evaluate governmental funding. Fortgang, at 529. In Fortgang, the Supreme Court noted the funding factor was inconclusive where the two considerations were split, but in that case the percentage-of-funding consideration weighed against functional equivalency. Here, that specific consideration weighs in favor of functional equivalency. Thus, the Court concludes that, while the two considerations could be considered to counterbalance, this factor weighs more towards functional equivalency.

(Footnote omitted.)

Regarding the extent to which the City of Seattle is involved in the

activities of DBIA Services, the trial court found and concluded the following:

Evidence of City involvement in DBIA Services' activities is scant. The City has almost no involvement in the day-to-day operations. Additionally, the Ratepayer Advisory Board has almost no involvement in the day-to-day operations. *Regulation* by the government does not weigh in favor of PRA applicability. See Fortgang, 187 [Wn].2d at 530-531, including footnote 14 cited by Plaintiff. The fact that DBIA Services provides an annual report and work plan to the Board and the City about its activities and costs, for example, does not establish government control. This type of transparency, to the contrary, indicates that government is not operating in secrecy. See id. Plaintiff emphasizes that the City Finance Director retains responsibility for the assessment process, Plaintiff's Motion for Summary Judgment 16-17, which underscores DBIA Services' separation from the City regarding assessments; this situation does not show enmeshment of the City in DBIA Services' operations. To the contrary, it establishes a clear delineation. Plaintiff also argues that the City gave discretionary authority to DBIA [Services], including "to make discretionary decisions about the MID's programming," Reply 4:21-23, and "over how to implement its programs." Reply 5:1. These statements amount to admissions weighing in favor of the conclusion that DBIA Services runs its day-to-day operations without City involvement or oversight. DBIA Services' autonomy in this regard does not show what Plaintiff is obligated to prove: that *the City*, not DBIA Services, in reality exercises this discretion. The situation is unlike Clarke because in Clarke the delegated authority concerned governmental

functions, i.e., police power enforcement.  That is not the case here.  Here, the delegation and lack of governmental control regarding functions that private parties can perform (in contrast to nondelegable public functions) weighs against application of the PRA.

Day-to-day control is also not shown by DBIA Services' contractual obligation to support all costs expended for the benefit of the MID with official documentation or the City's contractual right to audit DBIA Services' records "as they relate to the work."  As previously noted, regulation is to be distinguished from control.  Here, the moderate examples of interaction or regulation do not support a conclusion that the City directs DBIA Services regarding how to conduct daily business in the MID.  Because no evidence persuasively shows City participation in day-to-day management of services provided in the MID, this factor strongly weighs against PRA coverage.

Lastly, with regard to whether DBIA Services was created by the

government, the trial court found and concluded that

[p]rivate parties formed DBIA Services when the City enacted legislation to form the MID.  The purpose of the examination of an entity's "origin" is to determine if the entity is a masked arm of the government.  There is no evidence that formation of DBIA Services reflects any intent by the City to avoid the PRA by establishing another entity in name.  Rather, the evidence shows that a pre-existing organization, the Downtown Seattle Association, which represents key, private interests in the MID, formed the subsidiary entity to seek a fee-for-services management role.  Since formation, DBIA Services has accepted other fee-for-service roles, supporting a conclusion that it is not an alter ego of the City to run the MID, but is a private nonprofit corporation fulfilling contractual obligations.  Plaintiff argues that DBIA Services "was created by city ordinance," Reply 5-9, but this is inaccurate.  The MID was created by ordinance.  DBIA Services was incorporated under Washington law as a nonprofit.  Even if private incorporators "envisioned procuring a government contract when they formed the entity at issue," this does not demonstrate creation of the entity as an alter ego of the government. Fortgang, at 532, citing Oriana House, Inc. v. Montgomery, 854 N.E.2d 193 (Ohio 2006).  The timing of incorporation, upon which Plaintiff heavily relies, does not persuasively weigh in favor of a conclusion that the origin factor supports PRA coverage.  Thus, this factor weighs against PRA coverage.

(Footnote omitted.)

The trial court then ruled as follows:

> Having considered the factors on balance, even construing the [PRA] liberally in favor of the fullest possible public records access, the Court concludes the factors do not weigh in favor of PRA coverage. The factors regarding governmental function and city involvement in day-to-day functioning are the most persuasive to the Court. They strongly weigh against PRA coverage. This conclusion is also supported by the last factor, government creation, which also weighs against PRA coverage. Finally, while the Court finds the funding factor weighs in favor of functional equivalency, it does not do so convincingly. The Court is persuaded that the factors demonstrate that DBIA Services is not a private surrogate for the City, but is a government contractor not subject to the PRA. Overall, the Court is satisfied that impermissible avoidance of the PRA is not shown.

The trial court therefore ordered that

> 1.      For purposes of Plaintiff's requests for public records, Defendant DBIA Services is not a state or local "agency" as defined in RCW 42.56.010 of the Public Records Act.
> 2.      Applying the test adopted by the Washington Supreme Court in Fortgang v. Woodland Park Zoo, 187 Wn.2d 509, 387 P.3d 690 (2017), including all four Telford factors, the Court holds that Defendant DBIA Services is not the functional equivalent of a public agency.
> 3.      Defendant DBIA Services is not subject to the Public Records Act, Chapter 42.56 RCW, for purposes of Plaintiff's requests.

D

The trial court did not abuse its discretion. Overall, the trial court issued a well-reasoned order, provided the facts that the court considered and the law that the court applied to those facts, and properly applied the law to those facts.

For instance, in considering the performance of a government function factor, the trial court concluded that the policing authority remained with the City,

20

not with DBIA Services, because DBIA Services was only contracting for additional enforcement in the improvement area while the authority to perform the law enforcement in question remained with the Seattle Police Department. The trial court also concluded that the levying authority remained with the City, not DBIA Services, because the City retained the power to collect the revenues in question, control the assessment process, audit the special assessment ratepayers, and pay DBIA Services expenditures from a dedicated subaccount. The court also noted that Horvath did not contest the provision of business improvement as an inherently governmental function. Given all that, the trial court found that the performance of a government function factor weighed strongly against DBIA Services being functionally equivalent to a public agency. The trial court's reasoning was plainly tenable.

The trial court's consideration of the government funding factor was not untenable. The trial court concluded that almost 93 percent of DBIA Services' funding came from the revenues generated by the special assessment levy, which the court found weighed in favor of DBIA Services' functional equivalence to a public agency. The trial court also concluded that DBIA Services' contract with the City was a fee-for-services model, which the court concluded weighed against functional equivalence. Given the trial court's reference to our Supreme Court's preference for the source of funding over the nature of the funding as set

forth in Woodland Park Zoo, the trial court's determination that such factor weighed in favor of functional equivalence was not untenable.[18]

Additionally, the trial court's consideration of the level of the City's involvement in DBIA Services' activities was reasonable. The trial court determined that the evidence of the City's involvement in the nonprofit's activities was scant, finding that neither the City nor the advisory board were involved in DBIA Services' day-to-day activities and that the City had delegated significant discretionary authority to DBIA Services over the manner in which the nonprofit managed the provision of the relevant services in the improvement area. The court's determination that such an absence of involvement strongly weighed against DBIA Services' functional equivalence to a public agency was tenable.[19]

Furthermore, the trial court's consideration of the government creation factor was reasonable. Simply put, the trial court found that private citizens, not

_____

[18] Although it does not change the outcome of this matter, we conclude that the trial court erred in its determination that the agency funding factor weighed in favor of considering DBIA Services as a public agency.

Contrary to the trial court's determination, the statutory and municipal framework surrounding the creation and administration of a business improvement area, including the Metropolitan Improvement District, significantly reduces the quantum of control that a municipality maintains over the funding of that district. Indeed, pursuant to such framework, a municipality cannot legally spend a district's special assessment funds toward a purpose other than those purposes expressly identified in the initiation petition (or municipal resolution) and the resulting ordinance. This, in turn, reduces municipal oversight, control, and supervision over the improvement area, thereby reducing the monetary control retained by the municipality. Indeed, although a municipality has some discretion in how and when the services in question might be provided or in whether those services correspond to the identified purposes, the municipality's judgment is bounded by the legislative scheme, initiation petition, and municipal resolution and ordinance.

Given that, the trial court's reasoning underlying its determination of the government funding factor was, in this regard, erroneous. However, because the trial court properly considered and balanced the remainder of the factors herein, this error in the trial court's reasoning does not dictate an opposite result.

[19] Further supporting the trial court's determination is that, pursuant to the enabling legislation and adopting ordinance discussed herein, the private citizens' initiation petition, not the City of Seattle nor DBIA Services, determined the reasonable range of the specific services that the City could delegate to DBIA Services.

the City, created DBIA Services. Given that, the trial court's determination that the government creation factor weighs against DBIA Services' functional equivalence to a public agency was also tenable. Finally, the trial court's conclusion arising from its balancing of the functional equivalence factors reflects that the court individually weighed and properly balanced the factors in question.

Therefore, the court's conclusion after balancing those factors was not manifestly unreasonable and was within the range of acceptable choices that a reasonable judge could make. Thus, the trial court did not abuse its discretion in concluding that, pursuant to the functional equivalence test, DBIA Services was not a public agency for the purposes of Horvath's Public Records Act requests.

Accordingly, Horvath does not establish an entitlement to appellate relief.[20]

III

Horvath next contends that the trial court erred by determining that the Metropolitan Improvement District was not an agency as defined by the Public Records Act. Horvath is incorrect.

The trial court herein determined as follows:

The [Metropolitan Improvement District] in this case, and any [Parking and Business Improvement Area (PBIA)] in Washington, is a geographic area and not an actor. Evidence regarding DBIA Services' use of terms "MID" or "Metropolitan Improvement District"

---

[20] For reference, in the event the trial court herein had abused its discretion (again, we conclude that it had not), the remedy would be a reversal of the trial court's order and a remand for the court to properly exercise its discretion. See, e.g., Ralph v. Weyerhaeuser Co., 187 Wn.2d 326, 334-35, 386 P.3d 721 (2016) ("We therefore reverse and remand for the trial court to exercise its discretion in a manner consistent with this opinion."); Barker v. Mora, 52 Wn. App. 825, 831-32, 764 P.2d 1014 (1988) ("We reverse and remand for the trial court to exercise its discretion on the motion to substitute the personal representative for the deceased plaintiff.").

and "dba" terminology referencing the MID, or reference to "MID leadership" or "MID employees" in documents is not highly probative of the substance—over form—of DBIA Services' activities or proper application of the Telford factors generally. As noted, a MID cannot "do business" because it is a geographic area, not an actor. Business conducted to achieve the goals for the MID must be performed by others; in this scenario, either by the City as the government agency in whose jurisdiction the MID exists or by a contracted private party as authorized in the enabling legislation.

The trial court did not err. By concluding that the Metropolitan Improvement District is a geographic area, and is not an actor, the trial court determined that the District was not an entity capable of taking action and therefore was not itself capable of creating or possessing public records as defined by the Public Records Act. Moreover, the party identified in both Horvath's complaint and the case caption in this matter further suggest that the entity that was alleged to be "acting in the shoes of the government" was DBIA Services, not the geographic area identified by ordinance as the Metropolitan Improvement District. Thus, the trial court did not err by analyzing this case based on the actor in question—DBIA Services—rather than based on a business improvement area incapable of creating or possessing public records.

Horvath next contends that "[a]ny argument focused solely on DBIA Services' status under the Telford test is simply not relevant in resolving this issue." Reply Br. of Appellant at 8. However, given that Horvath submitted the records request in question to the Downtown Seattle Association requesting records about the Metropolitan Improvement District from DBIA Services, whether DBIA Services is an agency under the act—and thus must respond to

24

Horvath's requests or else face imposition of penalties—is plainly relevant on appeal.

Accordingly, Horvath again fails to establish an entitlement to appellate relief.

IV

Horvath requests an award of attorney fees should he prevail on appeal. The Public Records Act authorizes an award of attorney fees to a prevailing party. RCW 42.56.550(4). However, as analyzed herein, Horvath is not the prevailing party in this matter. Accordingly, we deny his request for such an award.

Affirmed.

Dwyer, J.

WE CONCUR:

Smith, C.J.          Mann, J.